908 N.E.2d 320 (2009)
In the Matter of the VISITATION OF C.L.H. B.L.H., Appellant-Respondent,
v.
G.L.H. and B.J.H., Appellees-Petitioners.
No. 32A01-0812-CV-597.
Court of Appeals of Indiana.
June 23, 2009.
Kathleen M. Sweeney, Robert A. Schemes, Indianapolis, IN, Attorneys for Appellant.

OPINION
NAJAM, Judge.

STATEMENT OF THE CASE
B.L.H. ("Mother") appeals from the trial court's order awarding G.L.H. ("Grandfather") and B.J.H. ("Grandmother") (collectively "Grandparents") visitation of Mother's son, C.L.H. Mother presents a single dispositive issue for our review, namely, whether the trial court abused its discretion *321 when it awarded Grandparents visitation with C.L.H.
We reverse.

FACTS AND PROCEDURAL HISTORY
Mother gave birth to C.L.H., out of wedlock, on October 7, 2001. C.L.H.'s father, T.Y. ("Father"), has not been substantially involved in C.L.H.'s life and does not provide child support. Mother had a complicated pregnancy and lived with her parents, Grandparents, during her pregnancy, and she and C.L.H. lived with Grandparents until October 2006, when Mother moved out. Grandparents were the primary caregivers of C.L.H. from July 2002, when Mother went back to work after C.L.H.'s birth, until mid-2007. From September 2002 until October 2004, Mother's employment as a CPA required her to be out of town three or four nights per week. Thereafter, Mother's employment required less travel. C.L.H. moved into Mother's new house in June 2007.
In early 2007, Mother met K.W., a woman, and the two began dating. After Mother told Grandparents about the relationship, Grandmother expressed to Mother her belief that homosexuality is a sin, that she was putting herself and C.L.H. in danger, and that Mother risked losing her job. K.W. quit her job and became primary caregiver to C.L.H. beginning in the Summer of 2007.
In July 2007, Grandmother had a stroke, and Grandfather told Mother that her homosexuality was the cause of Grandmother's stroke. In addition, Grandfather told Mother that K.W. was not welcome at the hospital to visit Grandmother. Thereafter, Mother tried to continue her relationship with Grandparents despite their obvious disapproval of her relationship with K.W., and Grandparents tried to keep up the relationship, as well. But Grandparents would ask Mother to visit without K.W., and Mother explained to Grandparents that K.W. was a member of her family and should be included in family get-togethers.
From July 2007 until November 2007, Grandparents and Mother had limited contact, and Grandparents had very limited contact with C.L.H. In November 2007, Grandparents invited Mother, K.W., and C.L.H. for a large family get-together at Grandparents' house, and everybody was civil. In addition, on two or three occasions in November and December 2007, C.L.H. visited Grandparents by himself, and Mother and K.W. hosted a dinner for Grandparents.
In December 2007, Grandmother tried to arrange with Mother a time when she, K.W., and C.L.H. could come over to celebrate Christmas. After a few phone calls, Mother agreed that her family would go to Grandparents' house on December 24. During a telephone conversation on December 23, Grandmother asked Mother whether C.L.H. could stay at Grandparents' house for a few days sometime between Christmas and New Year's Eve. Mother told Grandmother that she did not want C.L.H. to spend the night at their house because Mother was concerned that Grandparents would not keep C.L.H. on a bedtime schedule that she had instituted for him. Grandfather got on the phone and "question[ed] ... [Mother's] parenting authority over [C.L.H.]" Transcript at 162. Grandfather became angry with Mother and hung up on her.
Given the tenor of the telephone conversation on December 23, Mother decided not to take C.L.H. to visit Grandparents on December 24, as they had planned. Grandparents waited for them all day and called Mother several times, but got no answer. Grandparents went to Mother's house at approximately 9:00 p.m. that *322 night. Mother answered the door, but Mother would not let Grandparents see C.L.H. because he was in bed. Grandparents became upset, and Grandfather became "very angry" and "got in [Mother's] face." Id. at 164. Grandfather told Mother that she was a "low ... human being" and that she "was never to set foot on their property ever again." Id. Finally, Grandfather told Mother that "if anything were to ever happen to [C.L.H.] he'd make sure [she] was taken care of." Id. Mother felt physically threatened. Grandmother intervened at that point, and Grandparents left.
Thereafter, Mother stopped communicating with Grandparents, and, on April 14, 2008, Grandparents filed a petition for visitation under the Grandparent's Visitation Act. Mother filed a response to the petition, stating in relevant part that Mother was willing to arrange some contact between C.L.H. and Grandparents. The trial court appointed a guardian ad litem ("GAL") over Mother's objection. The GAL interviewed Grandparents, Mother, Father, C.L.H., K.W., and C.L.H.'s teacher and principal. In her report, the GAL found in relevant part as follows:
[C.L.H.] refers to Mother as "Mommy" and refers to [K.W.] as "Mom."
* * *
School personnel state that [C.L.H.] is a bright and happy first grade boy. His principal and his teacher state he is acclimating well to first grade and is normal and healthy. GAL met with [C.L.H.] and found him to be quite conversational, well-groomed, and healthy in appearance. [C.L.H.]'s classroom teacher stated he is very smart and a great student to have in class. [C.L.H.] spoke freely with GAL and seemed to have a very basic understanding that Mother and Grandparents are unhappy with one another at the present and that a judge is helping them work out their dispute.... GAL does not believe an in camera interview of [C.L.H.] would be helpful to the Court. GAL did ask [C.L.H.] about Grandparents and other extended family members and he was unable to articulate any clear memories of time spent with Grandparents or other family members, was unable to name other extended family members (beyond Grandparents whom he calls "Mamaw" and "Papaw"), and could not articulate for GAL any activities he might like to do or had previously done if he was with Grandparents or other extended family members. Given his age and the length of time that has passed since his last visit with Grandparents, GAL did not find this unusual. Mother states that [C.L.H.] occasionally asks about Grandparents.
* * *

It was clear from conversation[s] with everyone that Grandparents do not approve of [K.W.]. Beyond the fact that [K.W.] is a woman, Grandparents seem to be very offended by the active role Mother has afforded [K.W.] in the caregiving of [C.L.H.]. Grandparents believe that because of their role in [C.L.H.'s] life during his first five (5) years that they, not [K.W.], should be providing that care for him. When asked about specific actions that [K.W.] had taken which caused Grandparents concern, they cited two (2) situations to GAL. First, Grandfather relayed that early on in Mother's relationship with [K.W.], [K.W.] came to [C.L.H.'s] soccer game and after the game when the children were selecting snacks and drinks, [K.W.] took it upon herself to select [C.L.H.'s] drink for him. (He was five years old). Grandfather found that to be overbearing *323 and felt she was overstepping her bounds so early in the relationship. The second incident cited took place at a family get-together. Grandmother expressed concern that [K.W.] kept getting up from the adult's conversation to go to the back of the house to check on [C.L.H.]. Again, both grandparents felt this was overbearing and outside her authority. Both grandparents stated that [K.W.] "took over [Mother's] life" when they began dating. Grandparents feel that [K.W.] is obnoxious and bossy and they do not welcome her into their home. Grandmother finds her presence "too upsetting."
* * *
GAL's biggest concern is the family discord that is now present and which is illustrated by the fact that on December 23, 2007, plans had been made for [C.L.H.] to go to Grandparents[' house] for a brief period to get his Christmas gifts from Grandparents. Grandparents asked and did not understand why they could not have [C.L.H.] overnight (Mother did not want him to spend the night) and eventually there was a breakdown in communication.... [When Grandparents came over to Mother's house that evening,] [a]n argument ensued.... Grandfather states he was upset out of "concern for [C.L.H.'s] safety with [K.W.]" and he did tell Mother "if anything happens to [C.L.H.] you'll have to answer to me." He denies saying anything else, but admits the interaction did not go well.
* * *
Since the Christmas, 2007 incident there has been a total breakdown in communication. Mother sees no way to repair the relationship between herself and her parents and does not want [C.L.H.] to see them for fear that they will speak negatively about her, [K.W.], and their relationship. Grandparents state that they love Mother, want her back in their lives, and want to be able to see [C.L.H.]. When asked, Grandparents expressed a desire to have one weekend (Friday through Sunday) every third week, to be able to talk with [C.L.H.] on the phone once per week, to have him one night per week after school, and to have two (2) weeks of summer vacation with [C.L.H.]. Mother stated that initially she was willing to consider offering a limited visitation period in a public place each month, which Grandparents rejected as not enough time, and that Mother is no longer even comfortable with that.

CONCLUSION AND RECOMMENDATIONS
Case law provides that Grandparents have the burden of proving that Court-ordered visitation would be in the child's best interests. Grandparents have two very compelling arguments to offer the Court given their very active caregiving role with [C.L.H.] during his first (5) years and the fact that they are, as it appears to GAL, his only and best link to his extended family as Mother does not maintain an active relationship with her family at present. Both of these things are extremely positive for a child and his development.
However, case law also discusses the negative effect family discord may have on a child subject to Court-ordered grandparent visitation. GAL directly asked Grandparents if they could assure GAL that they would not speak negatively about Mother to [C.L.H.] and Grandfather vehemently denied that he would. Grandmother stated she would not, but with less conviction. GAL believes *324 that Grandmother would have major difficulty getting past Mother's choice of domestic partner and the fact she is a lesbian. GAL notes that both Grandparents have very negative feelings toward [K.W.] who, whether they like it or not is now "Mom" to [C.L.H.].

Mother was a very pleasant, intelligent, and articulate woman who expressed great affection and appropriate maternal feelings toward [C.L.H.]. GAL believes that [C.L.H.] is Mother's first priority, above and beyond any other relationship, and that she understands she has the ultimate authority for his upbringing and well-being, even when traveling. GAL also believes that [K.W.] places priority on [C.L.H.'s] well-being and takes very seriously her role as his day-to-day caregiver and that both women put forth a great deal of time and effort in determining how [C.L.H.] will be raised. It is Mother's absolute right to choose how to raise [C.L.H.] and to whom she will delegate responsibility for his care and well-being when needed. Mother clearly has been extremely hurt by the rejection she perceives from Grandparents.
GAL can understand and empathizes with Grandparents' heartbreak. They essentially, regardless of their own fault or blame, have been pushed aside by Mother and out of [C.L.H.'s] life. GAL cannot imagine how much they must miss [C.L.H.] as he is a wonderful and adorable little boy. However, it appears that this rift occurred when Mother's sexuality became a reality with the introduction of [K.W.] and the interactions between Mother and Grandparents digressed from that point.

The visitation schedule sought by Grandparents is not, in GAL's opinion, realistic. The proposed schedule is more akin to a non-custodial parent than a grandparent role. Throughout her interview with Grandparents, GAL sensed that Grandparents viewed this more from a custody battle frame of reference. That simply is not the case. Mother is a fit parent and appears to be making decisions based on what she believes to be in [C.L.H.'s] best interests. She has reasons for denying Grandparents visitation with [C.L.H.] which are valid given the interactions between the family members over the last year or so.

Appellant's App. at 152-59 (emphases added).
Following a hearing,[1] during which the parties agreed, unequivocally, that Mother is a fit parent, the trial court awarded Grandparents extensive visitation with C.L.H. The trial court found and concluded in relevant part:
5. This matter was commenced by Grandparents under the "Grandparent Visitation Act" which is codified at I.C. []31-17-5.
6. Grandparents have standing to seek grandparent visitation rights in this matter because [C.L.H.] was born out-of-wedlock. I.C. § 31-17-5-1(a)(3).
7. Specifically, in determining whether or not to grant court-ordered visitation to a grandparent, the Court must consider the best interests of the child. I.C. § 31-17-5-2(a).
8. The Court must enter specific findings and conclusions when determining whether or not grandparent visitation is ordered. With regards to the Court's findings and conclusions, four factors should specifically be addressed:
A. The presumption that a fit parent acts in his or her child's best interests;

*325 B. The special weight that must be given to a fit parent's decision to deny or limit visitation;
C. Whether the grandparent has established that visitation is in the child's best interests; and
D. Whether the parent has denied visitation or has simply limited visitation.
9. The Court may also consider whether or not the grandparent has had or has attempted to have meaningful contact with the child.
10. Because of the presumption given to a fit parent, grandparents bear the burden of proof in cases seeking court-ordered grandparent visitation.
* * *
17. Grandparents were very involved in [C.L.H.'s] life providing almost all of his care during the work week the first five years and eight months of his life.
* * *
25. Grandparents bear the burden of proving that it is in [C.L.H.'s] best interests that they be awarded visitation in spite of the presumption that Mother is a fit parent who has made her decision regarding visitation in [C.L.H.'s] best interests and the special weight given to her decision to deny Grandparents time with [C.L.H.].
26. Grandparents make two (2) very strong arguments in favor of their position. First, Grandparents had a very active role in the care of [C.L.H.] during infancy, toddler[-]hood and pre-school. Due to Mother's frequent travel and the fact that Mother and [C.L.H.] made their residence with Grandparents, they assumed a much greater caregiving role than that of most grandparents during the first five (5) years and eight months of [C.L.H.'s] life. Grandparents were [C.L.H.'s] primary caregivers during this time. Grandparents had more contact with [C.L.H.] than anyone else until [C.L.H.] moved into Mother's home in late June 2007. Second, Grandparents (Grandfather, in particular) expressed a desire that [C.L.H.] have the benefit of knowing and interacting with his extended family-not only Grandparents, but aunts, uncles, and cousins. Grandparents' other daughter, Ginger, has a daughter close to [C.L.H.'s] age and [ ] the two cousins had always been the best of friends while [C.L.H.] was residing with Grandparents. Now the cousins have no contact because Mother will not allow it.
* * *
29. Since the Christmas 2007 incident there has been a total breakdown in communication. Mother does not want [C.L.H.] to see Grandparents. Grandparents love Mother, want her back in their lives and want to be able to see [C.L.H.].
30. Case law provides that Grandparents have the burden of proving that court-ordered visitation would be in the child's best interests. Grandparents have two very compelling arguments to offer the Court given their very active care giving role with [C.L.H.] during his first five (5) years and eight months and the fact that they are his only and best link to his extended family as Mother has cut off any relationship with all members of her own family except [C.L.H.] and [K.W.]. Both of these things are extremely positive for a child and his development.
31. However, case law also discusses the negative effect family discord may have on a child subject to court-ordered grandparent visitation.

*326 32. Mother is an intelligent and articulate woman. Mother understands she has the ultimate authority for his upbringing and well-being. Mother presents as a very responsible person.
33. Mother is a fit parent. It is Mother's absolute right and responsibility to choose how to raise [C.L.H.] and to whom she will delegate responsibility for his care and well-being when needed. Mother never expressed to the Court that she loved [C.L.H.].[[2]]
34. Mother was unmoved by the absolute heartbreak expressed by Grandmother. Grandmother cried throughout much of the hearing. Mother was absolutely unmoved except she did sneer a few times when Grandmother struggled to gain composure when Grandmother was testifying.
35. What would be ideal for [C.L.H.] would be for Grandparents to find a way to accept Mother's homosexuality, to welcome [K.W.] as part of Mother and [C.L.H.'s] family and to understand that, while they filled an extremely important role in [C.L.H.'s] life from birth through pre-school, they are not his parents and do not have the status of parents nor the right to make demands upon Mother. Further, it would be ideal for [C.L.H.] if Mother could find a way to forgive her parents for their negative response to her homosexuality and her choice of partner, to see from their perspective their understandable hurt after being pushed out of [C.L.H.'s] life and Mother's life, and to find a way to give [C.L.H.] the gift of not only a loving immediate family, but also a loving extended family.
36. Mother expressed frustration with Grandparents for interfering with her efforts when she tried to teach [C.L.H.] manners, establish a regular bedtime, etc. Mother also expressed hurt because Grandparents did not approve of her homosexual relationship with [K.W.].
37. The Court believes Grandparents' primary frustration with [K.W.] is the fact that [K.W.] took their place in [C.L.H.'s] life.
38. [K.W.] did not testify. The Guardian Ad Litem interviewed [K.W.]. The Guardian Ad Litem did not express any reservations about [K.W.].
39. The Court realizes that Grandfather has probably made hurtful comments to Mother about her decision to have [K.W.] provide [C.L.H.'s] primary care. Mother has also hurt her parents, especially Grandmother by her refusal to communicate with them.
40. Court finds that it is in [C.L.H.'s] best interest that [C.L.H.] continue to have visitation with his grandparents.
Appellant's App. at 91-99. Accordingly, the trial court ordered that Grandparents are to have visitation with C.L.H. for ten hours per month. In addition, Grandparents are to have visitation with C.L.H. for eleven hours on Grandmother's birthday each year, eleven hours on the Saturday before C.L.H.'s birthday each year, one overnight during Christmas break each year, eleven hours on "Grandparents Day," and two overnights each in June and July every year. This appeal ensued.

DISCUSSION AND DECISION
We initially note that Grandparents have filed no appellees' brief in this case. Where the appellee fails to file a brief on appeal, we may, in our discretion, reverse the trial court's decision if the appellant makes a prima facie showing of reversible error. McGill v. McGill, 801 N.E.2d 1249, 1251 (Ind.Ct.App.2004). In this context, prima facie error is defined as "at first *327 sight, on first appearance, or on the face of it." Orlich v. Orlich, 859 N.E.2d 671, 673 (Ind.Ct.App.2006). This rule was established for our protection so that we can be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. McGill, 801 N.E.2d at 1251. Additionally, the statement of facts contained in appellant's brief is deemed by us to be accurate and sufficient for the disposition of this appeal. Johnson County Rural Elec. Membership Corp. v. Burnell, 484 N.E.2d 989, 991 (Ind.Ct.App.1985).

The Primacy of Parental Rights
In Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the United States Supreme Court recognized a fundamental right of parental authority, declaring that the right of parents to "establish a home and bring up children," including the control of their education, is a liberty interest protected by the due process clause of the 14th Amendment. Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Supreme Court reiterated that liberty interest. And in Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Supreme Court acknowledged a "private realm of family life which the state cannot enter," but also that the family is not beyond regulation in the public interest.
In Swartz v. Swartz, 720 N.E.2d 1219, 1221 (Ind.Ct.App.1999), this court observed:
Parents have a constitutionally recognized fundamental right to control the upbringing, education, and religious training of their children. By contrast, Grandparents do not possess a constitutional liberty interest in visitation with their grandchildren. When drafting the Grandparent Visitation Act, the legislature had to balance two competing interests: the rights of parents to raise their children as they see fit and the rights of grandparents to participate in the lives of their grandchildren. "It has long been recognized in our traditions and collective conscience that parents have the right to raise their children as they see fit." Visitation rights conferred by the Act are not a substantial infringement on the parent's fundamental rights because the Act only contemplates occasional, temporary visitation as found to be in the best interest of the child.
(Citations omitted). In other words, the Grandparent's Visitation Act carves out a narrow statutory exception to the otherwise sacrosanct parental authority in a child's upbringing.

Standard of Review and Grandparent's Visitation Act
In Woodruff v. Klein, 762 N.E.2d 223, 226-27 (Ind.Ct.App.2002), trans. denied, we set out the applicable standard of review and law on grandparents' visitation as follows:
When the trial court finds the facts specially and states its conclusions thereon pursuant to Indiana Trial Rule 52, the court on appeal shall not set aside the findings or judgment unless clearly erroneous. In applying a two-tiered standard of review, we "`determine whether the evidence supports the findings and the findings support the judgment.' In deference to the trial court's proximity to the issues, `we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment.'" We do not reweigh the evidence or determine the credibility of witnesses. Instead, we consider the evidence most favorable to the judgment, with all reasonable inferences *328 drawn in favor of the judgment....
We turn to the text of our Grandparent Visitation Statute and applicable case law.... Under Indiana's Grandparent Visitation Statute, a grandparent may seek visitation rights if the child [was born out of wedlock]. Ind.Code § 317-17-5-1(a)[(3)]. A court may grant the grandparent visitation rights if the court determines that visitation rights are in the best interests of the child. Ind.Code § 31-17-5-2(a). "In determining the best interests of the child ..., the court may consider whether a grandparent has had or has attempted to have meaningful contact with the child." I.C. § 31-17-5-2(b).
This court has recently ruled on the constitutionality of Indiana's Grandparent Visitation Statute in light of the U.S. Supreme Court's plurality opinion in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).[ ] In Crafton v. Gibson, this court, applying Troxel, held that Indiana's Grandparent Visitation Statute was not unconstitutional on its face. 752 N.E.2d 78, 98 (Ind.Ct.App.2001). Crafton also discussed the factors courts must take into consideration when determining a child's best interests under the Grandparent Visitation Statute. First, courts are to "presume that a fit parent's decision is in the best interests of the child." Crafton, 752 N.E.2d at 96 (citing Troxel, 530 U.S. at 69, 120 S.Ct. 2054). Acting under this presumption, courts must give special weight to a parent's decision to deny or limit visitation. See id. at 96-97. Second, a court should give some weight to the fact that a parent has agreed to some visitation. Id. at 97.
(Some citations omitted). Finally, in its discretion, the trial court may consider past meaningful contact between the grandparents and the child to determine the child's best interests. Id. at 228. That consideration, however, is not the touchstone for determining the child's best interests. Id. Grandparents bear the burden of rebutting the presumption that a parent's decision to deny visitation was made in the child's best interests. Hicks v. Larson, 884 N.E.2d 869, 874-75 (Ind.Ct. App.2008), trans. denied.
Here, in essence, Mother contends that the findings do not support the trial court's conclusion that visitation with Grandparents is in C.L.H.'s best interests. In particular, Mother maintains that because she is a fit parent, which is undisputed, there is a presumption that her decision on the issue of grandparent visitation is in C.L.H.'s best interests. Further, the trial court was required to give that decision special weight. And, Mother contends, her decision is valid and should be upheld in light of the significant family discord.
In Daugherty v. Ritter, 646 N.E.2d 66, 68 (Ind.Ct.App.1995), this court observed that:
The ultimate question is whether visitation in the face of family discord is in the child's best interest. That question can only be answered by looking at the totality of the circumstances presented. While the relationship may, in any given case, be sufficient to make grandparent visitation in the child's best interest, notwithstanding the dissension between the parent and grandparent, it may not be sufficient to overcome the effects of the discord on the child in another.
Here, the trial court's visitation order is not supported by its findings or the undisputed evidence. The record reveals a significant level of discord between Grandparents and Mother due to Mother's relationship with K.W. and K.W.'s relationship with C.L.H. The trial court *329 found that the parties had "hurt" one another, but the court's order does not indicate that it considered the totality of the circumstances in determining the best interests of C.L.H.
The GAL found that Mother's reasons for denying Grandparents visitation "are valid given the interactions between the family members over the last year or so." Appellant's App. at 159. While a trial court is not required to accept a parent's reasons for denying visitation with grandparents as necessarily true, Hicks, 884 N.E.2d at 875, here, the undisputed evidence shows that Mother is a reasonable person and has a rational basis for the decision, which she did not come to easily. The trial court did not make any finding regarding the validity or reasonableness of Mother's decision.
The evidence shows that Mother continued her relationship with Grandparents, even after Grandfather blamed Mother for causing Grandmother's stroke, but the discord escalated until their relationship became untenable for Mother. Mother tried for months to maintain her relationship with Grandparents in the face of their unwillingness to accept her relationship with K.W. and only gave up completely after she felt physically threatened by Grandfather on December 23, 2007. Grandparents did not have clean hands when they filed their petition for visitation. Confrontations initiated by Grandparents created unnecessary conflict and stress within the family. While they are entitled to their opinions concerning Mother's relationship with K.W., Grandparents' open hostility toward Mother created an unhealthy environment for C.L.H. In time, when civility is restored, Mother and Grandparents may reach a private reconciliation which enables Grandparents to visit with C.L.H., but under the circumstances Grandparents have failed to show that it is in the best interests of C.L.H. for the State to intervene and compel visitation against the well-founded concerns of Mother, who is a fit parent.
The decision to deny Grandparents visitation is not something that Mother took lightly. And, while Grandparents enjoyed a very significant relationship with C.L.H. during the first five years and eight months of his life, that fact is not the touchstone in determining C.L.H.'s best interests. See Woodruff, 762 N.E.2d at 228. Rather, the presumption is that Mother, a fit parent, has made a decision that is in C.L.H.'s best interests, and that decision deserves special weight under the law. We conclude that the trial court's findings do not support the conclusion that visitation is in C.L.H.'s best interests. Grandparents have failed to meet their burden and to rebut the presumption accorded to Mother. See Hicks, 884 N.E.2d at 876 (reversing trial court's grant of grandparents visitation where, contrary to trial court's finding, Father's decision to deny visitation was based on his reasonable concerns). Under the circumstances, we reverse the trial court's order awarding visitation to Grandparents.
Reversed.
FRIEDLANDER, J., and VAIDIK, J., concur.
NOTES
[1] Mother and K.W. were married in California in September 2008.
[2] This finding is curious, as no party has ever expressed any doubt that Mother loves C.L.H.