# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**WILLIAM J. KAISER**
**MARGARET M. CHRISTENSEN**
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**MICHAEL H. HAGEDORN**
Tell City, Indiana

FILED

Jul 15 2014, 10:17 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE GRANDPARENT VISITATION OF C.S.N.: | ) | |
| | ) | |
| BROOKE NEUHOFF, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 19A05-1311-MI-542 |
| | ) | |
| SCOTT A. UBELHOR and ANGELA S. UBELHOR, | ) | |
| | ) | |
| Appellee-Petitioners. | ) | |

APPEAL FROM THE DUBOIS CIRCUIT COURT
The Honorable William E. Weikert, Judge
Cause No. 19C01-1302-MI-117

**July 15, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

Appellant-Respondent, Brooke Neuhoff (Mother), appeals the trial court's Order awarding visitation with her minor child to the paternal grandparents, Appellees-Petitioners, Scott A. Ubelhor (Grandfather) and Angela S. Ubelhor (Grandmother) (collectively, Grandparents).

We reverse.

## ISSUE

Mother raises one issue on appeal, which we restate as: Whether the trial court erred in granting Grandparents' Petition for Grandparent Visitation (Petition).

## FACTS AND PROCEDURAL HISTORY

During her junior year of high school, Mother learned that she and her nineteen-year-old boyfriend, Justin Ubelhor (Father), were expecting a baby. Just eleven weeks before Mother gave birth, Father committed suicide. On June 8, 2010, by agreement between Mother and Grandparents, the trial court entered an order establishing Father's paternity, and on June 17, 2010, Mother gave birth to a son, C.N. (the Child). Because Mother was only seventeen years old when the Child was born, her parents (Maternal Grandparents) were appointed as the Child's guardians.[1] Mother and the Child live in Maternal Grandparents' home in Huntingburg, Indiana.

In August of 2010, Mother returned to school for her senior year, and the Child was enrolled in daycare. Mother continued her participation in extracurricular activities and

---

[1] Maternal Grandparents' guardianship over the Child was terminated on August 20, 2013.

2

graduated from high school with a grade point average of 3.9 on a 4.0 scale. Thereafter, she enrolled in the University of Southern Indiana to study accounting. In addition to being a full-time college student, Mother works for the accounting department of a large remanufacturing company.

Following Father's death, Mother maintained a close relationship with Grandparents. Grandmother hosted a baby shower for Mother, and she was present during the Child's delivery. For nearly the first three years of the Child's life, Mother made sure Grandparents were involved in the Child's baptism, birthday parties, holidays, and other celebrations. Likewise, Grandparents invited Mother to attend their family events. In addition to the special occasions, Mother took the Child for visits at Grandparents' house almost every Sunday. Although Mother stayed with the Child during the first few months of his life, as he became older, she would sometimes leave for several hours so that she could do homework, and Grandparents could enjoy their own time with the Child. The Child never spent the night with Grandparents.

Sometime in January of 2013, Grandmother heard a rumor that Mother intended to terminate Grandparents' contact with the Child because Mother believed that Grandparents "were low-life people[]" and "bad influences" who did not "deserve to be around [the Child]." (Transcript p. 16). When confronted by Grandmother, Mother denied ever making such statements and informed Grandmother that she "would never do that to [Grandparents]." (Tr. p. 16). Unwilling to risk the chance that Mother might keep the Child away from them, and because they wanted to have overnight visits with the Child, Grandparents filed their Petition on February 22, 2013. For the next several weeks, despite

3

Grandparents' legal action, Mother continued to take the Child for his Sunday visits with Grandparents.

Around this same time, Mother began to notice changes in the Child's behavior following his visits with Grandparents, specifically that the Child was crying more, acting out, and being aggressive. The Child's last visit with Grandparents occurred on Sunday, March 17, 2013. When Mother picked the Child up from Grandparents' house that afternoon, she became concerned by the Child's atypical behavior. Mother explained that the Child

> was crying and hitting and just terrified. . . . He cried for an hour and a half straight. He wanted no one to touch him [and] [w]anted nothing to do with anyone else. And then I . . . I started praying, and finally, he came up, and he said, mama, hold me. And he was shaking and shivering and just seemed really scared.

(Tr. pp. 67-68 (last alteration in original)). The next day, the Child had multiple potty-training accidents at daycare, which was highly unusual for him, and that night, Mother noticed that the Child had several bruises on his back. At this point, Mother decided to discontinue the Child's visitation with Grandparents. As a result, on April 12, 2013, Grandparents filed an Emergency Petition for Grandparent Visitation, alleging that Mother had retaliated against their Petition by denying them "all contact with [the Child] despite a previous parenting time routine and relationship prior to the filing of this case." (Appellant's App. p. 14). The trial court denied Grandparents' Emergency Petition.

On August 15, 2013, the trial court conducted an evidentiary hearing on Grandparents' Petition. On October 8, 2013, the trial court issued its Order granting visitation rights to Grandparents. In its findings of fact and conclusions thereon, the trial

court concluded that "[i]t is in [the Child's] best interest that he visit with [Grandparents]." (Appellant's App. p. 9). The trial court specified that, following a six-week transition period consisting of both supervised and unsupervised visits, Grandparents are entitled to unsupervised visitation time with the Child on alternating Sundays from 10:00AM to 6:00PM. On November 9, 2013, Mother filed a motion to stay the visitation Order pending the outcome on appeal, which the trial court denied on December 10, 2013.

Mother appealed, and on April 4, 2014, our court issued a memorandum decision, wherein we found that the trial court had failed to issue proper findings of fact and conclusions of law. *See In re Grandparent Visitation of C.S.N.*, No. 19A05–1311–MI–542, 2014 WL 1356851 (Ind. Ct. App. Apr. 4, 2014). We retained jurisdiction, stayed the visitation, and instructed the trial court to remit new findings and conclusions within thirty days. On April 25, 2014, the trial court issued its Revised Order.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In either granting or denying a petition for grandparent visitation, the trial court is obligated to issue specific findings and conclusions in its decree. Ind. Code § 31-17-5-6. Accordingly, we apply the two-tiered standard of review set forth in Indiana Trial Rule 52(A). First, we must consider whether the evidence supports the findings; second, we determine whether those findings support the judgment. *In re Visitation of M.L.B.*, 983 N.E.2d 583, 585 (Ind. 2013). We do not reweigh evidence or assess the credibility of witnesses, and we consider the evidence and all reasonable inferences in favor of the trial court's judgment. *Megyese v. Woods*, 808 N.E.2d 1208, 1213 (Ind. Ct. App. 2004). We

5

will "not set aside the findings or judgment unless clearly erroneous." Ind. Trial Rule 52(A). Regarding the factual findings, we "defer[] to the trial court's superior opportunity 'to judge the credibility of the witnesses.'" *In re Visitation of M.L.B.*, 983 N.E.2d at 585 (quoting *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009)). We will find the judgment to be clearly erroneous if "the findings fail to support the judgment" or if "the trial court applies the wrong legal standard to properly found facts." *Id.*

## II. *Grandparent Visitation Act*

The "interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). As such, the Fourteenth Amendment "provides heightened protection against government interference" in the right of parents "to direct the upbringing of their children." *Id.* In contrast, because "grandparents do not have the legal rights or obligations of parents," they "do not possess a constitutional liberty interest in visitation with their grandchildren." *McCune v. Frey*, 783 N.E.2d 752, 755 (Ind. Ct. App. 2003). Rather, decisions about the level of grandparent involvement in the lives of their grandchildren have historically been a matter of parental discretion. *In re Visitation of M.L.B.*, 983 N.E.2d at 585.

Nevertheless, states have recognized "that children should have the opportunity to benefit from relationships with statutorily specified persons—for example, their grandparents." *Troxel*, 530 U.S. at 64. As a result, the Indiana General Assembly enacted the Grandparent Visitation Act, which provides that there are limited circumstances under which "[a] child's grandparent may seek visitation rights." I.C. § 31-17-5-1. In the present

6

case, Grandparents were entitled to file their Petition because Father is deceased, as well as because the Child was born out of wedlock and Father's paternity was established. *See* I.C. § 31-17-5-1.

A trial court may grant grandparent visitation rights upon a determination that it would be "in the best interests of the child." I.C. § 31-17-5-2(a). In its evaluation of a child's best interests, a trial court "may consider whether a grandparent has had or has attempted to have meaningful contact with the child." I.C. § 31-17-5-2. However, this consideration "is not the touchstone for determining the child's best interests." *In re Visitation of C.L.H.*, 908 N.E.2d 320, 328 (Ind. Ct. App. 2009). Because "a child's best interests do not necessarily override" the "fundamental constitutional right" of natural parents "to direct their children's upbringing without undue governmental interference," our courts have endeavored to "strik[e] a balance between parental rights and children's interests." *In re Visitation of M.L.B.*, 983 N.E.2d at 586. To this end, our court has identified four factors that a trial court must consider in its decree granting or denying an award of grandparent visitation:

> (1) the presumption that a fit parent acts in his or her child's best interests;
> (2) the special weight that must be given to a fit parent's decision to deny or limit visitation;
> (3) whether the grandparent has established that visitation is in the child's best interests; and
> (4) whether the parent has denied visitation or has simply limited visitation.

*McCune*, 783 N.E.2d at 757. It was the trial court's failure to address all four of these "*McCune* Factors"—as they have come to be recognized—in its original Order that necessitated our remand and clarification. *See In re Visitation of M.L.B.*, 983 N.E.2d at

7

586. Having received the trial court's revised findings and conclusions, we now address Mother's claim that, in light of her constitutional rights as a fit parent, the trial court clearly erred in granting Grandparents' Petition.

A. *Fit Parent: Presumption and Special Weight*

In evaluating the first and second *McCune* Factors, the trial court found, and Grandparents concede, that Mother is a fit parent. Thus, the trial court acknowledged its obligation to presume that Mother acted in the Child's best interests in deciding to discontinue the Child's visits with Grandparents. *In re Visitation of C.L.H.*, 908 N.E.2d at 328. "Acting under this presumption, courts must give special weight to a parent's decision to deny or limit visitation." *Id.* However, the presumption favoring the parent is a rebuttable one. *Hicks v. Larson*, 884 N.E.2d 869, 874 (Ind. Ct. App. 2008), *trans. denied*. "Grandparents bear the burden of rebutting the presumption that [Mother's] decision to deny visitation was made in [the Child's] best interests." *Id.* at 874-75.

Here, the trial court concluded that Grandparents "have overcome the presumption that [Mother], as a fit parent, acted in the Child's best interest when terminating visitation on March 17, 2013, and by refusing to reinstate visitation during the period March 17, 2013[,] down to and inclusive of August 15, 2013." (Revised Order p. 10). Mother and Grandparents now disagree about whether Grandparents presented sufficient evidence to overcome "the significant burden of proof grandparents must carry to override [parental] decisions." *In re Visitation of M.L.B.*, 983 N.E.2d at 587. Mother asserts that the trial court inappropriately "inserted itself into the decision-making as to [the Child's] best interests, despite there being no reason to second guess [her] decisions." (Appellant's Br. p. 15).

8

Conversely, Grandparents argue that Mother is merely "seeking to have the evidence reweighed and considered in a light most favorable to her." (Appellees' Br. p. 12). Because the trial court awarded Grandparents less visitation time than they had under their prior routine, Grandparents further contend that Mother "can hardly claim that the trial court is unduly interfering in her fundamental right to [direct the Child's] upbringing." (Appellees' Br. p. 14).

During the trial, Mother cited several reasons in support of her decision to cease the Child's visits with Grandparents. In addition to the Child's worrisome behavior following his last visit with Grandparents, Mother's other concerns included: Grandfather's prior convictions for manufacturing methamphetamine and for domestic battery against Grandmother; Grandparents' exhibitions of aggression and hostility, such as Grandfather's physical altercations with Father and Grandmother's screaming match with a stranger in front of the Child; Grandparents' use of prescription drugs; and the unrelated individuals whom Grandmother had permitted to temporarily reside in the house despite their illicit drug use. While Mother's decision must be accorded special weight, the trial court is under no obligation to accept Mother's proffered explanation for restricting or denying the visitation "as necessarily true." *Hicks*, 884 N.E.2d at 875. Instead, the trial court is charged with hearing and weighing the evidence and determining whether Mother's justification for terminating Grandparents' visitation is valid. *Id.*

Contemplating Mother's proffered reasons, the trial court "place[d] little, if any, weight" on Grandfather's convictions because they "were more than twelve and thirteen years old by the time of trial." (Rev. Order pp. 7-8). The trial court also found that

9

Grandparents "have a good relationship"; it is no longer possible for any conflicts to occur between Grandfather and Father; Grandparents are prescribed medications for diagnosed medical conditions and follow their physicians' instructions; and "[t]he transient individuals have left the home." (Rev. Order p. 8). Additionally, because Mother had "full knowledge of all [of these] facts/events" at "the time she approved of, promoted and even fostered the healthy and meaningful relationship" between the Child and Grandparents, the trial court gave little credence to Mother's reasons for ceasing visitation. (Rev. Order p. 9). With respect to the Child's concerning behavior, the trial court found, in part:

23. Despite [Mother's] concerns, no evidence was produced that [the Child] was injured at [Grandparents'] home, no evidence was produced that [the Child's] unusual behavior or accidents at day care were the result of events that had occurred during grandparent visitation, and no evidence was produced identifying the source of the bruises resembling fingerprints discovered the following Monday while bathing [the Child] after attending day care. A police report was not filed. [The Department of Child Services] was not called. [Mother] did not inquire of [Grandparents] if [the Child] had been injured at their home.

* * * *

38. Both experts, the [guardian *ad litem*] and [Mother's] therapist, Alice Berger [(Berger)], testified that there was no information indicating that [the Child] would not be safe with [Grandparents].

39. [Mother] did not discuss [the Child's] unusual conduct with [Grandparents] to determine if something had happened during visitation on March 17, 2013[,] that was responsible for the conduct. [Mother] assumed that something had happened and as a result terminated visitation. [Mother's] decision was based, in part, on speculation.

* * * *

10

49. [Berger's] testimony that "something happened to change the [C]hild's behavior" cannot be attributed to [Grandparents]. [Berger] did not identify a reason for the change in behavior. Attributing the change to [Grandparents] is without a factual basis and is based on conjecture.

(Rev. Order pp. 6, 9, 11).

We are mindful of the deference to be accorded to the trial court regarding the weight of the evidence and assessment of witness credibility. However, by citing Mother's failure to prove misconduct by Grandparents, the trial court improperly shifted the burden to Mother to establish that she acted in accordance with the Child's best interests. Furthermore, we find that the failure of the trial court to mention certain evidence in its findings "shakes our confidence that it actually afforded [Mother] the presumption" and found that Grandparents presented sufficient evidence to overcome it. *Ramsey v. Ramsey*, 863 N.E.2d 1232, 1239 (Ind. Ct. App. 2007).

First, with the exception of an out-of-context statement by Mother's therapist, Berger, that there is no reason to believe the Child would be in danger at Grandparents' house, the trial court omits from its findings the remainder of Berger's opinion. Berger testified that Mother noticed a change in the Child's behavior surrounding the date that Grandparents filed the Petition, explaining Mother's concern that the Child cried more and acted aggressively following visits with Grandparents. Berger agreed that she did not see any safety problems with the recommendation of the guardian *ad litem* but noted that she had never met Grandparents. Because of Grandfather's past domestic violence, Berger recommended supervised visits in order to see the interaction between Grandparents and the Child. Berger also stated that Mother never accused Grandparents of mistreating the

11

Child; rather, "[Mother and Maternal Grandmother] noticed what [the Child] was saying to them about [Grandparents], and he was also having some difficulty after he left with his behavior. Things he said. And also having loose stools, etcetera." (Tr. p. 134). Because Mother had explained that visitation had always gone very well, but then "suddenly it didn't[,]" Berger was concerned that something had interfered to cause such a change in the Child's behavior. (Tr. p. 134). As a result, Berger told Mother that, "until she got to the bottom of it, it might be a good idea" to stop visitation during the pendency of the case. (Tr. p. 136). Therefore, regardless of whether the evidence proves that Grandparents were responsible for the Child's behavior, the undisputed evidence establishes that Mother's decision to stop the visitation was based on a rational concern and was made after consulting with her therapist.

Second, the trial court's findings do not reflect a consideration of the reasons proffered by Grandparents for filing the Petition. During the trial, Grandparents stated that a primary motivator for filing the Petition was to secure overnight visits with the Child. According to Grandfather,

> We . . . told [Mother], you know, that we filed [the Petition]. We didn't want the papers just coming through the mail and be a surprise. And, you know, we told her we didn't want no arguments. We didn't want a fight. We didn't want to drag this stuff out like this. We just wanted to keep him overnight.

(Tr. p. 84). Grandmother expressed a similar sentiment in the following colloquy at trial:

> Q. You have testified that you've been involved in all of these events. [Mother] would bring [the Child] to your house on Sundays. And even with all of that, you petitioned for grandparent visitation, correct?
> A. Yes.
> Q. Because you want more time than that?

12

A.   Yeah, we want overnight stays with him.

Q.   And that's the reason why you petitioned for the grandparents' visitation?

A.   That is the reason, and . . . they kept cutting our time shorter with him. There was never a set time.

(Tr. p. 34). Our court has previously found that grandparents are not automatically entitled to "to have the type of visitation they want." *Swartz v. Swartz*, 720 N.E.2d 1219, 1222-23 (Ind. Ct. App. 1999). Here, although the trial court did not address this evidence, it is apparent that Grandparents filed their Petition, in significant part, to override Mother's parental decision-making regarding overnight visits.

Grandmother also testified that one month before filing the Petition, she heard a rumor from a friend (who had learned it from someone else) that Mother intended to sever Grandparents' ties with the Child. The trial court found that

> [Mother] denied the statements and told [Grandmother] that she would never do that (even though she had been progressively reducing the amount of time [Grandparents] spent with [the Child]). [Mother] was informed that [Grandparents] had consulted with an attorney for their protection. [Mother] and [Maternal Grandparents] were invited to sit down and discuss the issues but they would never speak about it. The instant litigation ensued following this conversation and invitation.

(Rev. Order p. 5). We first note that Grandmother actually testified that she invited Mother and Maternal Grandmother "to sit down and discuss this matter" *after* she and Grandfather had filed the Petition. (Tr. p. 17). Despite its condemnation of Mother's decision to terminate visitation "based, in part, on speculation[,]" the trial court validated Grandparents' decision to sue for visitation rights based on an unverified, distant rumor and speculation that Mother might decrease their visits with the Child. (Rev. Order p. 9). As we have repeatedly held, courts cannot "infringe on the fundamental right of parents to

13

make childrearing decisions simply because a state judge believes a 'better' decision could be made." *Crafton v. Gibson*, 752 N.E.2d 78, 96 (Ind. Ct. App. 2001) (quoting *Troxel*, 530 U.S. at 72-73).

Finally, noticeably absent from the trial court's findings is a consideration of the fact that, by filing a lawsuit against Mother, Grandparents contributed to the parties' discord and certainly did nothing to make Mother feel more comfortable about leaving the Child alone in their care. *See In re Visitation of C.L.H.*, 908 N.E.2d at 329. The undisputed evidence reveals that Mother and Grandparents alike sensed the tension and hostility resulting from the inexplicable decline of their relationship. Nonetheless, Mother continued to drive the Child to Grandparents' house every Sunday, even for several weeks after Grandparents filed for visitation rights. Acknowledging that the Child exhibited concerning behavior following his last visit with Grandparents, the trial court found Mother's decision to cease visitation was unreasonable because she "assumed" that Grandparents were the cause without undertaking to investigate the actual reason. (Rev. Order p. 12). In light of *Grandparents'* significant burden to prove Mother's decision was contrary to the Child's best interests, along with the hostile environment, the correlation of the Child's unusual behaviors with visitation days, and the lawsuit, we find the trial court clearly erred as its findings do not indicate that it considered the totality of the circumstances in determining that Mother's decision to restrict visitation was unreasonable.

## B. *Denial or Limitation of Visitation*

Regarding its analysis of the fourth *McCune* Factor, the trial court concluded that Mother had "unreasonably denied visitation on March 17, 2013, and that the denial continued through the trial date on August 15, 2013." (Rev. Order p. 12). According to Mother, "the record is uncontroverted that [she] had involved [Grandparents] in [the Child's] life since his birth without any court order, and that she expressed every intention of doing so going forward." (Appellant's Br. p. 17). Conceding that Mother involved them in the Child's life for nearly three years, Grandparents assert that when their relationship with Mother began deteriorating near the end of 2012, their "[v]isitation times kept getting cut shorter and shorter." (Appellees' Br. p. 13).

Pursuant to *McCune*, the trial court must "give some weight to the fact that a parent has agreed to some visitation." *Megyese*, 808 N.E.2d at 1213. This factor is significant because "once a parent agrees to some visitation, the dispute is no longer over whether the grandparent will have any access to the child, but instead over how often and how much visitation will occur." *Crafton*, 752 N.E.2d at 97. Where a parent has denied all visitation, the grandparent must "pursu[e] the right to have a relationship with the child." *Id.* Thus, "the case for judicial intervention" is strengthened. *In re Visitation of M.L.B.*, 983 N.E.2d at 587. However, where there is merely a "disagreement between parent and grandparent over how much access is appropriate[,]" judicial intervention is more likely to infringe upon the parent's fundamental right. *Id.*; *Crafton*, 752 N.E.2d at 97.

In this case, we find it clear that the trial court accorded *no* weight to the fact that Mother permitted Grandparents to have regular contact with the Child for the first three years of his life and did not suspend the visitation until three weeks after Grandparents

15

filed the Petition. The trial court found that Mother's denial was unreasonable in light of a previous "routine [that] involved weekly visits at a minimum"; yet, the trial court failed to credit Mother for the fact that she initiated and maintained that weekly visitation regime without the court compelling her to do so. (Rev. Order p. 12). *See In re Visitation of M.L.B.*, 983 N.E.2d at 587. Even during the trial, Mother did *not* argue that Grandparents should be denied all visitation; instead, she asserted her preference that visitation occur once per month, for four to six hours, with no overnight stays and with supervision.

As we have stated, there is a significant difference in situations where a grandparent's visitation has been merely reduced versus denied entirely. Here, where the dispute "is not *whether* [the Child] and [Grandparents] will have a relationship but *on whose terms* it will be, there is no need for court intervention into [Mother's] decisions as a fit parent." (Appellant's Br. p. 17). Accordingly, the trial court's finding that Mother denied all contact between the Child and Grandparents is clearly erroneous based on the substantial evidence that Mother did not restrict Grandparents' visitation privileges until after they had filed the Petition. Furthermore, even considering that Mother terminated all visitation between the filing of the Petition and the trial, the trial court erred by conferring no weight to Mother's acknowledgment that the Child should continue to have a relationship with Grandparents.[2] The trial court's Order/Revised Order awarding visitation to Grandparents is hereby vacated, and Mother's discretion to determine the level of

---

[2] We do not address the third *McCune* Factor regarding the Child's best interests because Mother does not dispute that it is in the Child's best interests to have a relationship and spend time with Grandparents. Rather, it is Mother's position that she—not Grandparents—has the constitutional right to establish the parameters of the visitation.

Grandparents' visitation in accordance with her parental rights and the Child's best interests is restored.

CONCLUSION

Based on the foregoing, we conclude that the trial court clearly erred by awarding visitation to Grandparents.

Reversed.

MAY, J. concurs

VAIDIK, C. J. dissents with separate opinion

**IN THE**

**COURT OF APPEALS OF INDIANA**

IN RE: THE GRANDPARENT VISITATION )
OF C.S.N.: )
)
BROOKE NEUHOFF, )
)
    Appellant-Respondent, )
)
       vs. )    No. 19A05-1311-MI-542
)
SCOTT A. UBELHOR and )
ANGELA S. UBELHOR, )
)
    Appellees-Petitioners. )

**VAIDIK, Chief Judge, dissenting.**

The majority concludes that the trial court erred by awarding visitation to Scott and Angela Ubelhor ("Grandparents"). Because I believe the trial court did not err, I respectfully dissent.

Justin Ubelhor, Grandparents' son, committed suicide in 2010. Less than two months later, Brooke Neuhoff ("Mother") gave birth to their son, C.N. For nearly three years after C.N. was born, C.N. and Mother enjoyed, by all accounts, a healthy and loving relationship with Grandparents. Grandparents were present at C.N.'s birth and baptism. They attended C.N.'s birthday parties and spent time with C.N. during the holidays and at other family celebrations. And every Sunday, Mother would bring C.N. to Grandparents' home, where he would spend the day with Grandparents.

Things began to change in January 2013, when Mother's friend told Grandparents that Mother intended to terminate their relationship with C.N. because they were "low-life people[]," "bad influences," and "[didn't] deserve to be around [C.N.]." Tr. p. 16. Mother later denied saying such things. In February, Grandparents filed a petition for grandparent visitation. Appellant's App. p. 11-12.

For three weeks after Grandparents filed their petition, Mother continued to bring C.N. to Grandparents' home for Sunday visits. But when Mother suddenly cut off all contact between Grandparents and C.N. in March 2013, Grandparents filed an emergency petition for visitation. *Id.* at 13-14. The trial court denied the emergency request and set the matter for a hearing in August 2013.

At the hearing, Grandmother described the relationship between C.N. and Grandparents:

> It was amazing. We got to see [C.N.] every weekend. Sometimes we would actually see him more than one day. Sometimes, if we would get lucky, we'd have him Friday, Saturday, and Sunday. If he would get sick, there would be times that my daughter or I stayed home with him because [C.N.'s maternal grandmother] had to work and [Mother] had school. It was an amazing . . . I mean, every weekend we had this little boy.

Tr. p. 12-13. When C.N. visited, Grandparents would make his favorite breakfast, watch movies, play with blocks and puzzles, and play outdoors on the swing set. *Id.* at. 18. Grandmother described C.N. as a loving and affectionate "papa's boy" who always wanted his grandfather's attention. *Id.* at 20.

Mother testified that she stopped allowing Grandparents to visit with C.N. because he acted out after a visit with them in March 2013. *Id.* at 67. She also testified that C.N. had four accidents at day care following his last visit with Grandparents, and after she picked him up from day care, Mother noticed three bruises on his back. *Id.* at 51-52, 68. Mother admitted that she did not know the source of the bruises and never asked Grandparents or C.N.'s day-care provider about them. *Id.* at 53, 75. Mother also noted other concerns, including Grandfather's two criminal convictions from twelve years earlier and both Grandparents' use of prescribed medications; however, Mother acknowledged that she knew these things before C.N.'s birth and nonetheless fostered C.N.'s relationship with Grandparents. *Id.* at 70-74. When asked what visitation she would allow in the future,

Mother said Grandparents could have supervised visitation with C.N. once a month, for four to six hours.

Mother's therapist also testified. She had consulted the guardian ad litem (GAL) assigned to the case, and neither had concerns about Grandparents spending time with C.N. Both recommended that Grandparents be granted visitation. *Id.* at 129-30.

The trial court ruled in Grandparents' favor, and Mother appealed. On appeal, we remanded for the trial court to enter the required findings and conclusions. On remand, the trial court articulated its reasoning for granting Grandparents visitation with C.N. The court discussed C.N.'s relationship with Grandparents and Mother's concerns about Grandparents:

> [Grandparents] love [C.N.] very much. They are [C.N.'s] link to his father, and that is a big part of who [C.N.] is. [C.N.] has had a happy, healthy relationship with [Grandparents] during the past 2 years and 9 months.
>
> \*     \*     \*     \*     \*
>
> Prior to the filing of the Petition[,] [Mother] never complained of the manner in which [C.N.] was treated in [Grandparents'] home, except for the occasional sweets given to him. [C.N.] had never been injured. There was no physical discipline. [Mother's] only complaint concerning [C.N.'s] care and safety was registered after the Petition had been filed, at which time [Mother] terminated [C.N.'s] relationship with [Grandparents].

Revised Order p. 5-6 (formatting altered). The court found that there was no evidence that C.N. had been harmed while in Grandparents' care:

> *There is no evidence that [Grandparents] were responsible for [C.N.'s] unusual behavior on March 17, 2013, the potty accidents at day care, or the bruising discovered during the bath on March 18, 2013.* The[se] events . . . were isolated in nature, when considered in the context of the positive and

21

flourishing relationship enjoyed by [C.N.] and [Grandparents] over the past 2 years and 9 months.

* * * * *

[Mother] did not discuss [C.N.'s] unusual conduct with [Grandparents] to determine if something had happened during visitation . . . that was responsible for the conduct. [Mother] assumed that something had happened and as a result terminated visitation. [Mother's] decision was based, in part, on speculation.

*Id.* at 9 (emphasis added, formatting altered).

The court also acknowleged that Mother was a fit parent but expressed concern about whether she would allow C.N. to have a relationship with Grandparents absent a court order. *See id.* at 10 ("[Mother] told the GAL that she prefers [Grandparents] not have any contact with [C.N.] at this time."); 10-11 ("There is no reason, based on the evidence introduced at the trial of this cause, to believe that [Mother] will voluntarily reestablish the grandparent-grandchild relationship without a court order."). The court also noted that although Mother expressed concern about C.N.'s safety with Grandparents, the GAL and Mother's therapist did not share these concerns; in fact, they recommended that C.N. spend time with Grandparents. *Id.* at 11. Finally, the court concluded:

[Mother's] testimony of her concerns about [Grandparents] is in conflict with her actual behavior over the past two years and nine months while fostering and promoting [C.N.'s] relationship with [Grandparents]; the decline in her relationship with [Grandparents] provide[d] an excuse to stop the grandparent visitation; and, there was no effort on [Mother's] part to discuss and resolve any of the purported concerns she now expresses at the time the concerns allegedly occurred.

[Mother's] termination of the flourishing and healthy relationship between [C.N.] and [Grandparents] may affect [C.N.'s] emotional development and

22

the bond established beginning with his birth [and continuing] to the date on which she terminated the visitation, especially in light of the recommendations made by the GAL and [Mother's therapist]. [Mother's] decision interrupted a routine [C.N.] enjoyed[,] which was not in his best interests.

*Id.* The court found that Grandparents had presented sufficient evidence to "overcome the weight of [Mother's] decision-making authority," and had established that visitation was in C.N.'s best interests. *Id.* at 12.

Indiana's Grandparent Visitation Act requires specific findings of fact and conclusions. *See* Ind. Code § 31-17-5-6; *In re Visitation of M.L.B.*, 983 N.E.2d 583, 585 (Ind. 2013). The reviewing court applies "the two-tiered Indiana Trial Rule 52 standard of review"—we first determine whether the evidence supports the findings, and then whether the findings support the judgment. *M.L.B.*, 983 N.E.2d at 585 (citations omitted). "We set aside findings of fact only if they are 'clearly erroneous,' deferring to the trial court's superior opportunity 'to judge the credibility of the witnesses.'" *Id.* (citations omitted). The trial court's judgment is clearly erroneous when the findings do not support the judgment, or "when the trial court applies the wrong legal standard to properly found facts." *Id.* (citations omitted).

Four factors, called the *McCune* factors, guide trial courts in the grandparent-visitation context. When determining whether to grant grandparent visitation, a trial court must address the following:

(1) a presumption that a fit parent's decision about grandparent visitation is in the child's best interests (thus placing the *burden* of proof on the petitioning grandparents);

23

(2) the "special weight" that must therefore be given to a fit parent's decision regarding nonparental visitation (thus establishing a heightened *standard* of proof by which a grandparent must rebut the presumption);

(3) "some weight" given to whether a parent has agreed to some visitation or denied it entirely (since a denial means the very *existence* of a child-grandparent relationship is at stake, while the question otherwise is merely *how much* visitation is appropriate); and

(4) whether the petitioning grandparent has established that visitation is in the child's best interests.

*Id.* at 586 (citing *McCune v. Frey*, 783 N.E.2d 752, 757-59 (Ind. Ct. App. 2003)).

"The first three [McCune] factors implement the constitutionally protected right of fit parents to make child rearing decisions, and reflect the significant burden of proof grandparents must carry to override those decisions." *Id.* There is no dispute that Mother is a fit parent; thus, her decision regarding grandparent visitation is presumed to be in C.N.'s best interests. The trial court acknowledged this presumption but found that Grandparents had rebutted it, and I agree.

It is well settled that a trial court is required to give special weight to a fit parent's decision regarding grandparent visitation. But this requirement does not mean that a trial court must take at face value any explanation given by a parent. *K.L. v. E.H.*, 6 N.E.3d 1021, 1032 (Ind. Ct. App. 2014) (citation omitted). "The trial court must exercise the same duties it has in any other matter pending before it, namely, the duties of weighing the evidence and judging witness credibility." *Id.* "[I]t is the trial court's prerogative to listen to the evidence and determine whether a parent's alleged justification for denying or restricting visitation with grandparents holds water." *Id.*

The trial court ultimately determined that Mother's justification for denying Grandparents visitation did not, in fact, hold water. The trial court's lengthy findings, summarized here, explain why this is so:

- By all accounts, C.N. and Grandparents enjoyed a healthy and happy relationship and an established a routine of visitation for nearly three years before Mother terminated visitation
- Mother disrupted this routine and threatened C.N.'s emotional health by cutting off all contact between C.N. and Grandparents
- Grandparents offer C.N. a link to his deceased father
- There was no evidence that Grandparents were responsible for C.N.'s change in behavior after a March 2013 visit
- Mother's other concerns—such as Grandfather's criminal convictions from twelve years ago and Grandparents' authorized use of prescription medication—existed well before C.N.'s birth, and Mother fostered a relationship between C.N. and Grandparents despite this
- The GAL and Mother's therapist had no concerns about C.N.'s safety in Grandparents' care and recommended that Grandparents be granted visitation with C.N.

Citing the "amazing family relationship filled with love and affection" that C.N. enjoyed with Grandparents before this litigation, the court also determined that visitation was in C.N.'s best interests. Revised Order p. 3-4, 12. Notably, although Mother testified at trial that she would be willing to allow visitation under limited circumstances, the trial court found that "there [was] no reason . . . to believe that [Mother] will voluntarily reestablish the grandparent-grandchild relationship without a court order." *Id.* at 10-11. In light of the foregoing evidence, and deferring to the trial court's superior opportunity to judge the credibility of the witnesses, I would find that the court did not abuse its discretion in granting Grandparents' petition.[3]

---

[3] As our Supreme Court stated in *M.L.B.*, the "Grandparent Visitation Act contemplates only occasional, temporary visitation that does not substantially infringe on a parent's fundamental right to

Finally, the majority discusses Grandparents' decision to file a petition for visitation at length. Slip op. p. 12-14. The majority states that "by filing a lawsuit against Mother, Grandparents contributed to the parties' discord and did nothing to make Mother feel more comfortable about leaving the child alone in their care." *Id.* at 14. This sentiment gives me pause. At the time they filed their petition, Grandparents had no legal right to spend time with C.N., the only child of their deceased son. To Mother's credit, she had previously allowed Grandparents to spend time with C.N., but Mother's relationship with Grandparents had rapidly deteriorated in the months leading up to Grandparents' filing. Making matters worse, Grandparents heard that Mother intended to terminate their relationship with C.N. A grandparent-visitation petition was Grandparents' exclusive means by which to safeguard their right to continue their relationship with their grandson. The fact that Grandparents chose to take this action should not be held against them.

For these reasons, I respectfully dissent and would affirm the trial court.

---

control the upbringing, education, and religious training of their children." 983 N.E.2d at 586. The visitation awarded in this case—two hours per week at first, and eight hours every other Sunday at most— is of the type contemplated by the Act.