# FOR PUBLICATION



**FILED**

Nov 26 2014, 9:07 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DANIEL J. MOORE**
Laszynski & Moore
Lafayette, Indiana

ATTORNEY FOR APPELLEES:

**KATHLEEN M. SWEENEY**
Sweeney Hayes, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE GUARDIANSHIP OF C.R. AND A.R., | ) ) ) ) | |
| E.R., | ) ) | |
| Appellant, | ) | No. 79A05-1404-GU-176 |
| vs. | ) ) ) | |
| M.S. AND D.S., | ) ) | |
| Appellees. | ) ) | |

APPEAL FROM THE TIPPECANOE CIRCUIT COURT
The Honorable Benjamin A. Diener, Special Judge
Cause No. 79C01-1205-GU-45

**November 26, 2014**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

# CASE SUMMARY

Appellant E.R. is the maternal grandfather and adoptive father of minor children C.R. and A.R (collectively "the Children"). Appellees are the paternal grandparents of the Children (the "Grandparents"). The trial court awarded Grandparents visitation rights and, upon Grandparents' motion, ordered that a visitation evaluation be conducted. E.R. appeals the trial court's order on the visitation evaluation, arguing that the trial court did not have the authority to order the evaluation. E.R. does not contest the trial court's decision regarding the parameters of the visitation granted to Grandparents. Finding that the trial court did not have the authority to order a visitation evaluation, we reverse.

## FACTS AND PROCEDURAL HISTORY

On August 5, 2013, this court issued a memorandum decision regarding a prior appeal in this case. *In re Guardianship of C.S.*, Cause No. 79A02–1210–GU–863 (Ind. Ct. App. 2013). As outlined in that decision, the relevant background of this case is as follows:

> The facts are that the biological parents of C.S. and A.S.[1] divorced in May 2009. At the time, they had two children: four-year-old C.S. and two-year-old A.S. Approximately one month later, Biological Father went to Biological Mother's house and attacked her with a hammer, killing her. C.S. witnessed at least a portion of the attack. Shortly after Biological Mother's death, the children were the focus of a CHINS proceeding that culminated in the children being placed in Adoptive Father's custody. In conjunction with that proceeding, the court determined that the Paternal Grandparents would have visitation with the children one day each week, plus every other weekend.
> In January 2010, Adoptive Father sought guardianship of C.S. and A.S. His request was granted. At some point, the Paternal Grandparents sought to have Adoptive Father removed as guardian, and further sought guardianship of the children themselves. Meanwhile, Adoptive Father observed that the

---

[1] Although it is not mentioned in the record, we presume that C.R. and A.R. (as they will be referred to in this opinion) have begun using their mother's maiden name since the time of this court's decision in *In re C.S.*, in which they were referred to as C.S. and A.S.

children began to exhibit behavioral problems after returning from visits with the Paternal Grandparents. These problems included nightmares, night terrors, and C.S. waking up screaming in the middle of the night. Adoptive Father petitioned the court to reduce the amount of the Paternal Grandparents' visitation to one visit per month. Following a hearing, the trial court denied the request and ordered that the existing visitation order remain in effect.

Gloria Hood, a long-time therapist who worked at the Indiana Center for Children and Families, had been appointed by the court to work therapeutically with the children shortly after their mother's murder. During her work with the children, Hood consulted on a regular basis with Dr. Ann Annamis, a psychiatrist practicing with North Meridian Psychiatric Associates. Hood and Annamis discussed the case "frequently". Transcript at 16. During the course of working with the children, utilizing especially the therapeutic technique of play therapy, Hood eventually diagnosed C.S. as suffering from post-traumatic stress disorder (PTSD). In December 2010, Hood was asked to engage the services of another health-care professional, in this case psychiatrist Dr. David Crane, to "make sure that my assessment of [C.S.] in particular was on target and that I was not missing anything psychiatrically that I should be aware of." *Id*. at 19. Dr. Crane reviewed materials that Hood sent him in relation to her therapy with the children and conducted several therapy sessions with C.S. He formed the opinion that she was doing "a very adequate job" and thus, although he continued to counsel separately with C.S., Dr. Crane adopted a relatively passive therapeutic role with the child. *Id*. at 75.

As therapy progressed, Hood noted that C.S. "experience[ed] post-traumatic stress in some relationship to the visits in the [Paternal Grandparent] home." *Id*. at 35. C.S. shared with Hood on a number of occasions that "[Paternal Grandparents] want [the children] to come live with them." *Id*. at 36. A.S. also shared with Hood that the Paternal Grandparents wanted her to come live with them, but that she preferred to live with Adoptive Father. Ultimately, both Adoptive Father and the Paternal Grandparents sought separately to adopt the children. The court granted Adoptive Father's petition and he adopted them. Sometime around March 2012, after Adoptive Father had adopted the children, Hood became concerned that visitation with the Paternal Grandparents might involve "some other situation that is continuing to keep the issue of his father having killed his mother and his struggle about what that means in his life active for [C.S.]." *Id*. at 37. As a result, Hood opined that the visitation arrangement with the Paternal Grandparents should be modified, at least for a time. Specifically, she recommended that for a period of at least six months, the children should visit with the Paternal Grandparents an hour or two every week or every other week and that the visits should be supervised. Dr. Crane believed that Hood's recommendation "should be given a lot of weight". *Id*. at 80.

In light of Hood's recommendation, on June 22, 2012, Adoptive Father filed a Petition For Extended Hearing For Modifying And Supervising Grandparent Visitation. In it, Adoptive Father stated:

> It is now in the best interest of [C.S.] and [A.S.] that the paternal grandparent visitation continue pursuant to Gloria Hood's recommendation, wherein for a period of time the grandparent visitation will be supervised by an agency for at least six (6) months, that the contact of [Paternal Grandparents] with [C.S.] and [A.S.] be limited to that agency setting for at least six (6) months, and thereafter a determination be made as to what is the appropriate continued visitation between [C.S.] and [A.S.] and their paternal grandparents.

> *Id*. at 32. Following a hearing, the trial court denied Adoptive Father's motion, entering extensive findings of fact and conclusions of law in support of its ruling. This is the ruling that Adoptive Father challenges. Further facts will be supplied where relevant.

*In re C.S.,* slip op. at 1-2 (first set of brackets supplied; all others in original). On appeal, we

reversed the trial court's ruling denying E.R.'s motion and remanded with the following

instructions:

> It will be the trial court's task upon remand to determine how many times per week or month the Paternal Grandparents should visit with the grandchildren and how long each visit should last. As indicated previously, whatever the frequency and duration, the visitation must be supervised, and this schedule will last for six months, after which Hood will evaluate the children's therapeutic progress and fashion her recommendation as to the future course of visitation, accordingly.

*In re C.S.,* slip op at 9. On January 16, 2014, Paternal Grandparents filed a petition to resume

visitation and requesting a parenting time evaluation.[2] E.R. filed a response and a motion *in*

---

[2] Grandparents' expert witness, Dr. Jeffrey Vanderwater-Piercy, testified that the requested evaluation would consist of clinical psychologists conducting several interviews with the parties involved, reviewing records, and consulting with other professionals, all of which would cost $6,000 (if performed by his office as Grandparents requested). Dr. Vanderwater-Piercy estimated that each interview would take multiple hours, depending on the depth of information needed from the interviewee.

*limine* which requested that the trial court not hear testimony from Grandparents' expert witnesses, who were called to testify on the potential benefits of a visitation evaluation. At a hearing concerning the petition, the trial court denied E.R.'s motion *in limine* and subsequently issued an order which reads, in pertinent part, as follows:

> 6) Grandparents shall be entitled to exercise supervised visitation up to twelve (12) hours per month.
>
> * * * *
>
> 12) Father must, at a minimum, allow grandparent visitation pursuant to paragraphs six (6) through nine (9).
>
> * * * *
>
> 16) Grandparents may subject the children to and pay for what has been referenced as a visitation study or a forensic analysis ("requested study").
> 17) Grandparents shall be responsible for costs associated with the requested study ("requested study costs").
>
> * * * *
>
> 22) [E.R.] is advised that he is not ordered to participate in the requested study, but that a decision to not participate in the requested study may result in the neutral third party making findings regarding [E.R.] that are not favorable to [E.R.].
> 23) The requested study's benefit to the children is speculative; accordingly the costs of the requested study shall be paid by the Grandparents and shall not be covered by the children's trust.

Appellants' App. 42-43 (brackets supplied).

## DISCUSSION AND DECISION

On appeal, E.R. contends that the Grandparents did not have any basis to request a visitation evaluation, and the trial court did not have the authority to order such an evaluation. In the alternative, E.R. argues that the trial court abused its discretion by ordering the study despite evidence that it would not be in the Children's best interest. E.R. does not contest the trial court's determination regarding the terms of Grandparents' visitation.

### I. Standard of Review

5

Determining the extent of the trial court's authority in this case, specifically whether it has the authority to order a visitation evaluation, obliges this court to render a statutory interpretation.

> "Statutory interpretation is a question of law reserved for the court and is reviewed *de novo*. *De novo* review allows us to decide an issue without affording any deference to the trial court's decision…. Our goal in statutory construction is to determine, give effect to, and implement the intent of the legislature."

*In re N.S.*, 908 N.E.2d 1176, 1180 (Ind. Ct. App. 2009) (quoting *Shaffer v. State*, 795 N.E.2d 1072, 1076 (Ind. Ct. App. 2003).

## II. Whether the Trial Court Had Authority to Order a Forensic Visitation Evaluation of the Minor Children

Indiana Code section 31-17-2-12 provides the statutory basis for requesting and ordering a parenting time evaluation: "In custody proceedings after evidence is submitted upon the petition, *if a parent or the child's custodian so requests*, the court may order an investigation and report concerning custodial arrangements for the child." (emphasis added). A "[c]hild custody proceeding" is defined as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue." Ind. Code section 31-21-2-5. For purposes of juvenile law, a "custodian" is "a person with whom a child resides." Ind. Code section 31-9-2-31.

Under the express language of Indiana Code 31-17-2-12, Grandparents are not eligible to request a custody evaluation as they are neither the parents of nor the custodians for C.R. and A.R. Additionally, under the plain language of the statute, the trial court does not have the authority to order such an evaluation, in a visitation proceeding, absent a request to do so

6

from a parent or custodian. Grandparents provide no alternative authority under which they would be entitled to request a visitation evaluation, nor is this court aware of any such authority. When asked by the trial court whether they were aware of any authority for a visitation examination, Grandparents responded, "I can't find any statutory authority for that, but many items in family law don't have specific statutory authority, but nonetheless, the Court can craft methods to determine the child's best interest in what the Court wants to do." Tr. p. 15. However, Grandparents did not provide any examples at the petition hearing or in their appellate brief which illustrate other ways in which a trial court is allowed to "craft methods" to determine a child's best interest absent authority. In fact, The Indiana Grandparent Visitation Act, Indiana Code chapter 31-17-5, expressly provides additional means by which the court may ascertain the best interests of the child, such as interviewing the child in chambers. Ind. Code section 31-17-5-2(c). Noticeably absent from this list is any type of visitation evaluation or investigation.

After the Grandparents conceded that they knew of no authority entitling them to a visitation evaluation, the trial court expressed its reluctance to grant such a large degree of rights to grandparents.

> I don't think the law, at least as currently written, provides grandparents that extent of rights, and so that is the reservation this Court would have is if we are putting the grandparents on equal footing as the father and allowing for parenting time evaluations and things of that nature, what's the end game? Because we are not going to have a modification of custody hearing. The grandparents that are exercising visitation are never going to come close to the legal relationship with the child that they're potentially seeking. So what's the end game?

7

Tr. p. 16. Despite the trial court's reservations, it denied E.R.'s motion *in limine* and heard testimony from experts regarding what the proposed evaluations would entail and whether the evaluations would help the court determine the best interests of the Children. After E.R. voiced his disagreement, the trial court responded, "[a]lthough I think your motion is completely accurate with the status of the law. I think we are probably exceeding the scope of what grandparent visitation is and can be, but we will run that risk and then we will make findings and enter orders later." Tr. p. 21.

As the trial court acknowledged, the law currently provides no authority for grandparents to request visitation evaluations and this court finds no reason to read Indiana Code section 31-17-2-12 to provide as such. "The cardinal rule of statutory construction is that if a statute is unambiguous, then we need not and cannot interpret it; rather, we must apply its plain and clear meaning." *Vanderburgh Cnty. Election Bd. v. Vanderburgh Cnty. Dem. Cent. Comm.*, 833 N.E.2d 508, 510 (Ind. Ct. App. 2005). The Indiana Legislature could have added grandparents with visitation rights to the list of individuals eligible to request a parenting time study under Indiana Code section 31-17-2-12; however, it chose not to. Although we cannot know the intent of the legislature, we do not believe this exclusion was unintentional. In other Indiana family law statutes, the legislature has limited the power of the trial court when determining grandparents' visitation rights, as opposed to rights of a parent or custodian. Indiana Code section 31-17-6-1, the authorizing statute for court appointment of Guardians ad litem and Court Appointed Special Advocates ("CASA"), reads as follows: "A court, in a proceeding under [Indiana Code sections] 31-17-2, [] 31-17-4, this

8

chapter, [] 31-17-7, or [] 31-28-5, may appoint a guardian ad litem, a [CASA], or both, for a child at any time." The Grandparent Visitation Act, Indiana Code Chapter 31-17-5, was not included, presumably because the legislature did not think it appropriate for courts to have such a potentially burdensome appointment power in cases of grandparent visitation. The Grandparent Visitation Act itself makes no mention of a grandparent's ability to request or compel a visitation evaluation, or any other evaluation for that matter. Furthermore, the Grandparent Visitation Act has been subject to strict interpretation. "The Grandparent Visitation [Act] was enacted in derogation of the common law, creating rights which had not previously existed. Where a statute creates rights in derogation of the common law, the statute must be strictly construed." *In re Visitation of J.D.G.*, 756 N.E.2d 509, 512 (Ind. Ct. App. 2001).

Presumably, the legislature does not want grandparent visitation issues to have the potential to escalate into something akin to full blown custody disputes or subject children to psychological evaluations against the wishes of the parent or guardian. To that point, this court has staunchly limited the visitation rights of grandparents, especially when those rights are in conflict with the wishes of a fit parent. *See generally In re Visitation of C.L.H.*, 908 N.E.2d 320, 329 (Ind. Ct. App. 2009) (courts must give special weight to a fit parent's decision to deny or limit grandparent visitation and grandparents seeking visitation bear the burden of rebutting the presumption that a fit parent's decision to deny visitation was made in the child's best interest); *In re Visitation of C.S.N.,* 14 N.E.3d 753 (Ind. Ct. App. 2014) ("because grandparents do not have the legal rights or obligations of parents, they do not

9

possess a constitutional liberty interest in visitation with their grandchildren."). It is not this court's place to provide grandparents with a newfound right to request psychological evaluations for their grandchildren against the wishes of the parents. Should the legislature wish to provide grandparents that power, it can do so at any time.

Accordingly, we find that Grandparents did not have standing to petition the trial court for a parenting time evaluation and that the trial court did not have the authority to order such an evaluation *sua sponte*. Because there was no authority to order the evaluation, we need not address whether the evaluation was in the best interest of the Children. We reverse the portions of the trial court's March 20, 2014 order concerning the visitation study (Sections 16 through 23). The provisions of the order concerning Grandparents visitation time with the Children are unaffected by this decision.

The judgment of the trial court is reversed.

BARNES, J., and BROWN, J., concur.