## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 27 2016, 6:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

E. Kent Moore
Laszynski & Moore
Lafayette, Indiana

ATTORNEY FOR APPELLEES

Amy O. Carson
Massillamany & Jeter, LLP
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Guardianship of C.R. and A.R.

E.R.,

*Appellant-Respondent,*

v.

M.S. and D.S.,

*Appellees-Petitioners.*

December 27, 2016

Court of Appeals Case No. 79A02-1603-GU-569

Appeal from the Tippecanoe Circuit Court

The Honorable Thomas Busch, Judge

Trial Court Cause No. 79C01-1205-GU-45

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, E.R. (Adoptive Father)[1] appeals the trial court's Order awarding visitation to the Appellees-Petitioners, M.S. (Grandfather) and D.S. (Grandmother) (collectively, Paternal Grandparents) with his minor children C.R. and A.R. (collectively, Children).

We reverse.

## ISSUE

Adoptive Father raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court abused its discretion in denying Adoptive Father's request to modify the Paternal Grandparents' visitation.

## FACTS AND PROCEDURAL HISTORY

We observe that this is Adoptive Father's third appeal and we adopt the recitation of the relevant facts as set forth in Adoptive Father's first appeal as:

> [T]he biological parents of C.[R]. and A.[R].[2] divorced in May 2009. At the time, they had two children: four-year-old C.R. and two-year-old A.[R]. Approximately one month later, Biological Father went to Biological Mother's house and attacked her with a hammer, killing her. C.[R]. witnessed at least a portion of the

---

[1] Adoptive Father is also the Children's biological maternal grandfather.

[2] In the First Appeal, the Children were using Biological Father's last name and were referred to as C.S. and A.S. However, later on, the Children began using their biological mother's maiden name and were referred to as C.R. and A.R.

attack. Shortly after Biological Mother's death, the [C]hildren were the focus of a CHINS proceeding that culminated in the [C]hildren being placed in Adoptive Father's custody. In conjunction with that proceeding, the [trial] court determined that the [biological] Paternal Grandparents would have visitation with the [C]hildren one day each week, plus every other weekend.

In January 2010, Adoptive Father sought guardianship of [the Children]. His request was granted. At some point, the Paternal Grandparents sought to have Adoptive Father removed as guardian, and further sought guardianship of the [C]hildren themselves. Meanwhile, Adoptive Father observed that the [C]hildren began to exhibit behavioral problems after returning from visits with the Paternal Grandparents. These problems included nightmares, night terrors, and C.[R]. waking up screaming in the middle of the night. Adoptive Father petitioned the [trial] court to reduce the amount of the Paternal Grandparents' visitation to one visit per month. Following a hearing, the trial court denied the request and ordered that the existing visitation order remain in effect.

Gloria Hood, a long-time therapist who worked at the Indiana Center for Children and Families, had been appointed by the [trial] court to work therapeutically with the [C]hildren shortly after their mother's murder. During her work with the [C]hildren, Hood consulted on a regular basis with Dr. Ann Annamis, a psychiatrist practicing with North Meridian Psychiatric Associates. Hood and Annamis discussed the case "frequently." During the course of working with the [C]hildren, utilizing especially the therapeutic technique of play therapy, Hood eventually diagnosed C.[R]. as suffering from post-traumatic stress disorder (PTSD). In December 2010, Hood was asked to engage the services of another health-care professional, in this case psychiatrist Dr. David Crane, to "make sure that my assessment of [C.R.] in particular was on target and that I was

not missing anything psychiatrically that I should be aware of."
Dr. Crane reviewed materials that Hood sent him in relation to
her therapy with the [C]hildren and conducted several therapy
sessions with C.[R]. He formed the opinion that she was doing
"a very adequate job" and thus, although he continued to counsel
separately with C.[R]., Dr. Crane adopted a relatively passive
therapeutic role with the child.

As therapy progressed, Hood noted that C.[R]. "experience[ed]
post-traumatic stress in some relationship to the visits in the
[Paternal Grandparents'] home." C.[R]. shared with Hood on a
number of occasions that "[the Paternal Grandparents] want [the
Children] to come live with them." A.[R]. also shared with
Hood that the Paternal Grandparents wanted her to come live
with them, but that she preferred to live with Adoptive Father.
Ultimately, both Adoptive Father and the Paternal Grandparents
sought separately to adopt the [C]hildren. The [trial] court
granted Adoptive Father's petition and he adopted them.
Sometime around March 2012, after Adoptive Father had
adopted the [C]hildren, Hood became concerned that visitation
with the Paternal Grandparents might involve "some other
situation that is continuing to keep the issue of his father having
killed his mother and his struggle about what that means in his
life active for [C.R.]." As a result, Hood opined that the
visitation arrangement with the Paternal Grandparents should be
modified, at least for a time. Specifically, she recommended that
for a period of at least six months, the [C]hildren should visit
with the Paternal Grandparents an hour or two every week or
every other week and that the visits should be supervised. Dr.
Crane believed that Hood's recommendation "should be given a
lot of weight."

In light of Hood's recommendation, on June 22, 2012, Adoptive
Father filed a Petition For Extended Hearing For Modifying And
Supervising Grandparent Visitation.

*In re Guardianship of C.S.*, No. 79A02-1210-GU-863 (Ind. Ct. App. Aug. 5, 2013) (internal citations omitted). Following a hearing on Adoptive Father's petition to modify, on October 1, 2012, the trial court entered extensive findings of fact and conclusions of law denying the petition. The relevant findings of fact and conclusions stated:

> 8) Shortly after the CHINS case was closed . . ., [Adoptive Father] informed [the Paternal Grandparents] that they would not be allowed their upcoming week night visit, nor would they be allowed their visit the following weekend. While the testimony is divided as to whether it was [Adoptive Father's] intent to eliminate all visits or significantly curtail the visits, it is clear that, at a minimum, it was [Adoptive Father's] intent to greatly reduce the [Paternal Grandparents'] visitation time with the children.

> 9) [Adoptive Father] has now filed with this court a motion to reduce [the Paternal Grandparents'] visitation, this time [to] two (2) hours per month, supervised in an agency setting.

> 10) [Adoptive Father] has raised his belief that [the Paternal Grandparents] have facilitated contact between the children and [Biological Father], as his reason for making this request.

> ****

> CONCLUSIONS OF LAW

> 7) In applying the law to the facts in this case, this court finds [Adoptive Father's] decision to eliminate, or to allow only two (2) hours per month of supervised visitation, to be unreasonable. Therefore, [the Paternal Grandparents] have overcome the

presumption that a fit parent's decision regarding grandparent visitation is best.

9) It is also clear that the [Paternal Grandparents] have had a significant and ongoing relationship with [C.R.] and [A.R.] for the entire lives of the [C]hildren. It is in the [C]hildren's best interests to continue their visitation with [the Paternal Grandparents].

*In re Guardianship of C.S.*, No. 79A02-1210-GU-863, at *3.

[5] Adoptive Father appealed (First Appeal). Adoptive Father argued that the trial court's judgment was erroneous as some of its findings were not supported by the evidence. Upon review, we first concluded that the trial court had come to the erroneous conclusion that Adoptive Father's petition to modify visitation was premised upon his own selfish desire to reduce contact between the Children and the Paternal Grandparents. On this issue, we noted that Adoptive Father's petition to modify grandparent visitation, was based upon Hood's recommendation and was not driven by his personal interest. Secondly, we found the trial court's finding that Adoptive Father's petition was instituted on the belief that Paternal Grandparents had enabled some contact between the Children and Biological Father was likewise erroneous. Specifically, we concluded that although Adoptive Father believed that the Paternal Grandparents were facilitating contact, that fact was not mentioned in his petition. Lastly, we concluded that the trial court's finding, stating that Father's petition requested a reduction of the grandparent visitation to two hours, was equally erroneous. On this issue, we established that Father's petition did not

propose or request a specific visitation schedule. Instead, Adoptive Father had requested the trial court to modify visitation in accordance with Hood's recommendation—*i.e.*, that the new visitation arrangement should include only supervised visitation and without any specification as to how long each visit should last. Accordingly, we reversed the trial court's order denying Adoptive Father's petition to modify grandparent visitation and remanded with the following instructions:

> It will be the trial court's task upon remand to determine how many times per week or month the Paternal Grandparents should visit with the [Children] and how long each visit should last. As indicated previously, whatever the frequency and duration, the visitation must be supervised, and this schedule will last for six months, after which Hood will evaluate the [C]hildren's therapeutic progress and fashion her recommendation as to the future course of visitation, accordingly.

*In re Guardianship of C.S.*, No. 79A02-1210-GU-863, at *9.

[6] Following remand, Adoptive Father requested a change of venue and the matter was transferred from Tippecanoe County Circuit Court to Carroll County Circuit Court. On January 22, 2014, the Paternal Grandparents filed a petition to resume visitation and for a visitation evaluation. Adoptive Father filed his response and the trial court held a hearing on March 10, 2014. On March 20, 2014, the trial court issued an order establishing a visitation schedule that for a period of six months, visitation was to be supervised by professionals employed by Child and Family Partners, Inc. in Lafayette, Indiana. The trial

court awarded a total of twelve hours of visits per month with no more than six hours per visit. Also, the trial court granted the Paternal Grandparents' request for a visitation evaluation.

[7] Thereafter, Adoptive Father filed his second notice of appeal (Second Appeal). In *In re Guardianship of C.R. & A.R.*, 22 N.E.3d 657, 661 (Ind. Ct. App. 2014), we addressed Adoptive Father's issue regarding the March 20, 2014 order granting the Paternal Grandparents' request for a visitation evaluation. Adoptive Father contended that the Paternal Grandparents did not have any basis to request a visitation evaluation, and the trial court did not have the authority to order such an evaluation. We concluded that under the plain language of Indiana Code section 31-17-2-12, "the trial court does not have the authority to order [a child custody] evaluation in a visitation proceeding, absent a request to do so from a parent or custodian." *Id.* We therefore reversed the sections of the trial court's order concerning the visitation study.

[8] Visitation commenced on April 1, 2014, and the visits were supervised by Debra Apple (Apple) of Child and Family Partners. Apple's role was to maintain the Children's safety during the visits. With each visit, Apple allowed C.R. to pick the room where visits would take place and she informed the Children that they could alert with sounds and signals whenever they felt uncomfortable. Apple supervised approximately seventy-two hours of visits and she provided detailed reports after each visit. Apple was always within hearing and visual reach during the visits. During the visits, the Paternal Grandparents brought food, games, and belated holiday gifts with them. Also,

because the Children's birthdays fell during the visitation period, the Paternal Grandparents brought birthday gifts. According to Apple, with almost each visit, the Children hugged and kissed the Paternal Grandparents without prompting, they were comfortable, and made expressions of love and endearment. During the course of the visits, Apple once heard A.R. state that she wished she could go to the Paternal Grandparents' house, and C.R. agreed. In another visit, C.R. told Grandmother that he was always happy spending time with her and that God was number one is his life and Grandmother was number two. Apple also observed the Children's demeanor. She noted that, routinely, the Children would "be very subdued and almost sad" when they arrived at the facility for the visits; however, they would be very happy upon seeing the Paternal Grandparents. (Tr. p. 226). Apple's overall observation was that the Children were closely bonded with the Paternal Grandparents. The last visit occurred in September of 2014, and the Children were dismayed by the fact that it would be the last time they visited with the Paternal Grandparents. According to Apple, throughout the visits, she did not observe any interaction between the Children and the Paternal Grandparents that gave her any concern. Based on her observations, toward the end of the supervised visits, Apple suggested that the supervised visits should be moved into the Paternal Grandparents' home. Apple pointed out that the Child and Family Partners offices was a sterile environment to have visitations.

[9] In accordance with the March 20, 2014 order which required Hood to assess the Children's therapeutic progress and proffer her recommendation at the end

of the six-month period, Hood issued her findings and recommendations on March 26, 2015. Prior to issuing her report, Hood received Apple's visitation notes. Hood noted that

> When visitation moved to a supervised setting, [C.R.] maintained his confidence and school performance but showed greater emotional disregulation. [C.R.] related in play therapy that he preferred visiting in the supervised setting, as compared to in the [Paternal Grandparents'] home. PTSD themes though minimized re-occurred.

(Conf. Exh. D). With regard to Apple's role as visitation supervisor, Hood was of the opinion that Apple was biased. Specifically, Hood stated that Apple was of the false impression that the Paternal Grandparents, and not the Children, were her clients. Based on her findings, Hood recommended to appoint a new visitation supervisor; and that visitation should be supervised and occur at least four times a year for a period of four to six hours.

[10] On December 1, 7, and 16, 2016, the trial court held a status hearing to evaluate the future course of the Paternal Grandparents' visits. Hood testified that prior to the First Appeal, when visitation was occurring in the Paternal Grandparents' home, C.R. was emotionally withdrawn: he had melt downs and lacked confidence. Hood testified that C.R. showed PTSD symptoms which were demonstrated repeatedly during play therapy sessions. It was Hood's opinion that when the visitation was suspended following our remand in the First Appeal, from August of 2013 until April of 2014, C.R. demonstrated increased confidence, diminished emotional distress, began sleeping well on his

own, and enhanced his performance at school. Hood also reported that A.R. is happy in Adoptive Father's home. It was Hood's opinion that there is an obvious affection between Adoptive Father and the Children, and the Children depend on Adoptive Father for nurturing, safety, and comfort.

[11] At the time of the status hearing, Hood's frequency in meeting with the Children had lessened to approximately once every five weeks for C.R. and even less often for A.R. primarily due to their progress and adjustment. In 2015, Hood met with C.R. a total of eight times. Hood testified that C.R. has developed into a well-adjusted child who is getting straight A's in school, sleeps in his own bed, attends Boy Scouts, and has friends. With respect to Apple's request, Hood rejected the idea of moving visitations from the facility to the Paternal Grandparents' home. At the close of her testimony, Hood recommended the appointment of a different visitation supervisor and preservation of supervised visits to occur at least four times a year for about four to six hours. Hood's status report of March 26, 2015, did not set an end-date to the quarterly supervised visits that she had proposed; however, at trial, she advised that these supervised visits should perhaps remain until C.R. entered his *teenage years* "where he could [] speak about his own adjustment and his own needs." (Tr. p. 68). At the time of the hearing, C.R. was eleven years old and A.R. was eight years old.

[12] While the First Appeal was pending, in 2013, Hood referred C.R. to Dr. Jane Yipp (Dr. Yipp), a neuro scientist and a visiting professor at Purdue University, to undergo brain mapping. Hood believed that Dr. Yipp would aid her with

additional information other than what she had established in her play therapy sessions with C.R. Dr. Yipp testified that she conducted a review of C.R.'s brain activity and brain circuit connectivity. Five tests were conducted in 2013 and a single test in 2015. Dr. Yipp stated that she tracked C.R.'s results and compared them with a statistical data base of individuals that are considered "normal.". (Tr. p. 81). Dr. Yipp described the process as completely automated and was similar to a blood or urine test. Dr. Yipp testified to at least 10,000 peer reviewed articles supporting this sort of testing. Dr. Yipp explained C.R.'s brain mapping results after visiting with the Paternal Grandparents as showing brain activity that is outside the normal range to the point of concern. On the other hand, the one test conducted in 2015, when C.R. was not visiting with the Paternal Grandparents, the results showed significant normalization of the brain map.

[13] Following Dr. Yipp's testimony, Dr. Tracy Gunter (Dr. Gunter), an associate professor for clinical psychiatry and professor of law at Indiana University, testified as an expert witness for the Paternal Grandparents. Dr. Gunter specified that the equipment that Dr. Yipp used for the brain mapping was not FDA approved for providing a diagnoses, and further reported that there were no peer reviewed studies to support her study. Dr. Gunter was of the opinion that if there were concerns with C.R.'s stress levels while visiting with the Paternal Grandparents, then the Paternal Grandparents should have been present during the testing. In addition, Dr. Gunter opined that the stress exhibited by C.R. was not necessarily a bad thing. Dr. Gunter concluded that

Dr. Yipp's brain mapping tests had not achieved any degree of acceptance in the relevant scientific community and her reports were of no benefit to the trial court in determining the visitation.

[14] C.R.'s psychiatrist, Dr. Crane, also testified. Dr. Crane, who was seventy-eight years old, stated that he had seen C.R. intermittently over the past five years and estimated he had nearly forty sessions with C.R. Dr. Crane indicated that his appointments with C.R. had been less frequent in the last few years, and in 2015, he saw C.R. on two occasions. At the status hearing, Dr. Crane rejected the idea that a child may suffer from PTSD. Following Dr. Crane's testimony, Adoptive Father called Dr. Crane's wife. Dr. Crane's wife stated that five years ago, Dr. Crane was examined by a neurologist for early signs of dementia. Dr. Crane's wife added that in the past six months, Dr. Crane had limited ability, on occasion, to piece his thoughts together. Dr. Crane's wife stated that when Dr. Crane testified on December 1, 2015, there was some confusion with his testimony—*i.e.,* Dr. Crane was asked how long he had practiced as a physician or an attorney, and he stated those were hard questions. In addition, Dr. Crane's wife testified that following Dr. Crane's reversal of C.R.'s PTSD diagnosis, "there was weeping that occurred when he was confronted with the report[,] he began speaking of some of the men or veterans in Vietnam and the content changed from [C.R.]." (Tr. p. 264). In conclusion, Dr. Crane's wife indicated that her husband exhibited early signs of dementia.

[15] At the close of the evidence, the trial court instructed the parties to file their proposed findings of fact and legal conclusions. On February 16, 2016, the trial

court entered its Order stating, in part, that the Paternal Grandparents had overcome the presumption that Adoptive Father's decision to limit their visitation was in the Children's best interest. As such, the trial court concluded that Hood's proposal that Paternal Grandparents' visitation should be limited to quarterly supervised visits by a new agency for an indefinite period of time was unreasonable; and Adoptive Father's decision to rely on Hood's commendation was likewise unreasonable. Thus, the trial court ordered the reestablishment of unsupervised visitation of "every other weekend from 10:00 a.m. Saturday to 6:00 p.m. Sunday." (Amended Appellant's App. Vol II, p. 47). In addition, the trial court granted the Paternal Grandparents "two (2) weeks of uninterrupted parenting time each summer." (Amended Appellant's App. Vol II, p. 47).

Adoptive Father appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In determining matters of family law, we accord "substantial deference" to the decisions of the trial court. *In re Visitation of L-A.D.W.*, 38 N.E.3d 993, 997, (Ind. 2015). Pursuant to Indiana Code section 31-17-5-6, the trial court supported its Order for grandparent visitation with specific findings of fact and conclusions thereon. As such, on appeal, our court applies the well-established, two-tiered Indiana Trial Rule 52 standard of review: first, we consider whether the evidence supports the trial court's findings; second, we determine whether the findings support the judgment. *In re Visitation of H.B.*, 21 N.E.3d 867, 870

(Ind. Ct. App. 2014) (quoting *In re visitation of M.L.B.*, 983 N.E.2d 583, 585 (Ind. 2013)). We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error if "there is no evidence supporting the findings or the findings fail to support the judgment [,]" or if the trial court "applies the wrong legal standard to properly found facts." *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009).

## II. *Grandparent Visitation*

Grandparents "do not have the legal rights or obligations of parents," and "do not possess a constitutional liberty interest in visitation with their grandchildren." *Swartz v. Swartz*, 720 N.E.2d 1219, 1221-22 (Ind. Ct. App. 1999). On the other hand, parents do have a "constitutionally recognized fundamental right to control the upbringing, education, and religious training of their children." *Id.*; *see also Troxel v. Granville*, 530 U.S. 57, 65-66, (2000). However, our legislature has enacted the Grandparent Visitation Act (Act), Ind. Code § 31-17-5-1, recognizing that "a child's best interest is often served by developing and maintaining contact with his or her grandparents." *Swartz*, 720 N.E.2d at 1221; *see Troxel*, 530 U.S. at 63-64 (discussing rationale for protecting relationship between grandparent and child). Accordingly, Indiana Code section 31-17-5-1 constitutes a balance between "the rights of parents to raise their children as they see fit and the rights of grandparents to participate in the lives of their grandchildren." *Id.*

[19]   Under the Act, a trial court may grant visitation rights if it determines that "visitation rights are in the best interest of the child." I.C. § 31-17-5-2. This determination is a matter for the trial court's discretion, and we will reverse only upon a showing of an abuse of that discretion. *Swartz*, 720 N.E.2d at 1221. An abuse of discretion exists where the trial court's decision is clearly against the logic and effects of the facts and circumstances before the trial court or the reasonable, probable deductions to be drawn therefrom. *Id*. We will neither reweigh the evidence nor judge the credibility of the witnesses. *Id*.

[20]   We note that grandparent visitation must be balanced with the fact that the "natural parents have a fundamental constitutional right to direct their children's upbringing without undue governmental interference," and "a child's best interests do not necessarily override that parental right." *Id*. at 586. To protect this fundamental right, our supreme court has mandated that a trial court's order on grandparent visitation must address the following four factors:

> (1) a presumption that a fit parent's decision about grandparent visitation is in the child's best interests (thus placing the burden of proof on the petitioning grandparents);
>
> (2) the "special weight" that must therefore be given to a fit parent's decision regarding nonparental visitation (thus establishing a heightened standard of proof by which a grandparent must rebut the presumption);
>
> (3) "some weight" given to whether a parent has agreed to some visitation or denied it entirely (since a denial means the very existence of a child-grandparent relationship is at stake, while the

question otherwise is merely how much visitation is appropriate); and

(4) whether the petitioning grandparent has established that visitation is in the child's best interests.

*Id*. Moreover, "the Grandparent Visitation Act contemplates only occasional, temporary visitation that does not substantially infringe on a parent's fundamental right" to direct his or her child's upbringing. *Id*. at 588.

[21] In the instant case, after our remand in the First Appeal, there is no dispute that the trial court followed our instructions and ordered supervised visitation. In its visitation order of March 20, 2015, the trial court directed that the supervised visits should run for six months and Hood to proffer her recommendations thereafter. In a three-day evidentiary hearing in December 2015, the trial court heard testimonies of the parties and then on February 16, 2016, the trial court issued its Order stating, in part,

> 41. The court finds that [Dr.] Yipp's brain mapping tests are not based on generally accepted scientific principles and that the tests were not concluded in a way that could yield valid results. The [c]ourt disregards the testimony and the findings of [Dr.] Yipp entirely.

> 42. The [c]ourt finds that [Dr.] Crane no longer adheres to a diagnosis of PTSD for [C.R.] and therefore Hood's continued diagnosis of PTSD lacks medical basis. Dr. Crane's dementia makes his supervision of Hood unreliable with respect to the specific questions whether Hood's current recommendation is valid.

43. The [c]ourt finds that the recommendation of Hood reflect[s] bias. An unbiased therapist would have allowed Apple to observe visitation in the [Paternal Grandparents'] home to determine whether visitation in that venue was causing stress to [C.R.]. The refusal to proceed with that examination reflect[s] a bias. The recommendation that supervised visits continue indefinitely reflect a bias.

****

CONCLUSIONS OF LAW

****

2. The [] [Paternal Grandparents] have overcome the presumption that [Adoptive Father's] decision to limit their visitation is in the best interest of the [Children] by clear and convincing evidence.

3. [] Hood's recommendation that grandparent visitation be limited to quarterly visits supervised by a new agency for indefinite period of time is unreasonable and lacks reasonable basis.

4. [Adoptive Father's] decision to accept recommendation of [] Hood is unreasonable.

5. It is in the [C]hildren's best interest to resume unsupervised visitation with the [Paternal Grandparents].

6. The [Paternal Grandparents] shall have unsupervised visitation every other weekend from 10:00 a.m. Saturday to 6:00 p.m. Sunday.

7. The [Paternal Grandparents] shall have two (2) weeks of uninterrupted parenting time each summer. Written notice of the dates of parenting time shall be given to [Adoptive Father] at least ninety (90) days in advance.

(Amended Appellant's App. Vol II, pp. 45-46). On appeal, Adoptive Father raises two main contentions: (1) the trial court's findings and conclusions relating to Hood's recommendation is unsupported by the evidence; and (2) the trial court's finding concerning Dr. Crane is facially contradictory and unsupported by the evidence.

## A. *Hood's Recommendation*

Finding #43 of the February 16, 2016 Order stated that Hood's recommendation was biased, since an unbiased therapist would have allowed Apple to observe visitation in the Paternal Grandparents' home in order to determine whether visitation in that venue was causing stress to C.R. The trial court further stated that Hood's proposal that supervised visits should continue indefinitely was also prejudiced.

In his appellate brief, Adoptive Father contends that Apple had no therapeutic relationship with the Children, and Hood's rejection of Apple's request is not a reflection of bias. Adoptive Father first points out that Apple was not the Children's therapist and was therefore not in a positon to make pertinent recommendations with regard to visitation. Further, Adoptive Father contends that "Apple did not have the history of the case, had not had significant or long

lasting contact with the [C]hildren, and functioned solely as a supervisor for the [Paternal Grandparents'] visits." (Appellant's Br. p. 17).

[24] At the status hearing in December 2015, Apple stated that she has a Master's of Science in guidance and counseling with an emphasis on community counseling. Apple testified that her primary role in the instant case was to maintain the safety of the Children during the visits. Apple indicated that she was familiar with the background of the case. Specifically, Apple testified that toward the beginning of her appointment as a visitation supervisor, Hood called her and indicated that she wanted her to have "all the appropriate information" regarding the case. (Tr. p. 224). Apple stated that Hood thereafter sent an email of "some drawing that [C.R.] had created in therapy," and accompanying information with respect to that diagram was offered via telephone. (Tr. p. 224). When Apple was questioned as to why she advised that the visits be relocated to the Paternal Grandparents' home, she explained that after "speaking with [] Hood," she highlighted that she did not observe "anything of concern," and that Child and Family and Partners was a "very sterile environment" to have visitations. (Tr. pp. 235-36). Apple further explained that her proposal was based on Hood's previous concern "that something was occurring in the home" therefore causing stress for C.R. (Tr. p. 236). At the close of her testimony, and over Adoptive Father's objection, Apple stated that she would recommend future unsupervised visitations to occur at least twice monthly "for these parents and it could be weekends." (Tr. p. 240). Apple testified that her endorsement took into consideration the importance of the

Children having a "meaningful relationship" with the Paternal Grandparents. (Tr. p. 241). During cross-examination, Apple was again asked about her contextual knowledge regarding the case. Apple testified she was unaware of the date when biological mother was killed, or whether C.R. observed it. Apple indicated that "I do not know all of the specifics, I know the generalities of what happened in this case and how it opened. I didn't profess to be an expert on the history." (Tr. p. 242). In addition, Apple testified that she had not reviewed any of Hood's or Dr. Crane's reports regarding the Children, and had only gone through "a few court orders;" however, she could not recall the specific orders she had read. (Tr. p. 243).

[25] The record shows that Hood has been the Children's therapist since June of 2009 after biological mother's murder. Hood has a Bachelor's Degree in social work, a Master's of Science with an emphasis in marriage and family therapy, and twenty-six years of experience in the area of abuse and neglect for children and families of trauma. Hood testified that she had "a large body of information from [her] own relationship and interaction with the [C]hildren in hours of therapy." (Tr. p. 47). Hood stated that in recommending future supervised visits, she took into account various factors: First, she highlighted C.R.'s past PTSD symptoms while visiting with the Paternal Grandparents; the fact that C.R.'s PTSD symptoms had greatly narrowed during the period of supervised visitation; and that C.R.'s PTSD symptoms were nonexistent when the visits were not taking place. Accordingly, Hood stated that in balancing those factors and based on the importance of ensuring that C.R. had a "life that

is free from the former symptoms," future supervised visitations were vital. (Tr. p. 25). When asked as to why she disregarded Apple's proposal to move the supervised visits from the facility to the Paternal Grandparents' home, Hood testified that

> [I] questioned the validity of her conclusions based on the fact that I think her observations were in a very narrow context. She had no history of a case, was not interested in gathering history of the case from me and I think that [she] was basing her recommendations simply on what she saw and not on a larger context of information that was available. This case had gone on for many years before it got to [] Apple and I didn't believe that it was appropriate for a recommendation to be made based on observations of visitation and limited setting as well as []Apple had specifically emphasized to me that her clients in this situation were not the [C]hildren but her clients were the [Paternal Grandparents]. I found that to be rather odd and also suggest[ed] some bias towards the [Paternal Grandparents] best interest as opposed to the [C]hildren's best interest.

(Tr. pp. 52-53).

[26] We observe that our instructions on remand in the First Appeal was that the Paternal Grandparents' visitation would be supervised and last for six months. The trial court's March 2014 visitation order clarified that visitation would be overseen in an agency setting and Hood should offer her recommendations thereafter. From the record, it appears that Apple and Hood had comparable educational backgrounds and both were qualified therapists. However, the March 2014 visitation order set their roles apart. The trial court appointed Child and Family Partners to supervise the visitation sessions. Hood remained

as the Children's therapist and her role was to tender her recommendation after the six months of supervised visits. Based on the March 2014 visitation order, Apple, having a supervisory role, overstepped her mandate by suggesting that the visits should be moved to the Paternal Grandparents' home. Moreover, as we noted in the foregoing, Hood's rejection of Apple's proposal was based on some genuine concerns, *i.e.*, the fact that Apple's recommendation was based on a very narrow context, Apple had limited background information, and because Apple viewed the Paternal Grandparents as her clients.

[27] In light of the foregoing, we conclude that Finding #43, stating, in part, that Hood's denial of Apple's request showed bias, is unsupported by the evidence. Hood's focus in the instant case had been to provide therapeutic support to the Children. In the First Appeal, we valued Hood's role as the Children's therapist. We noted Hood's concern of C.R.'s heightened stress levels when he visited with the Paternal Grandparents. Notably, part of the reason we remanded was because the "evidence showed that something in relation to those visits was, as Hood phrased it, stirring up C.[R]." *In re Guardianship of C.S.*, No. 79A02-1210-GU-863, at *9. Remarkably, in the most recent order of February 16, 2016, the trial court even credited Hood's therapy sessions and it specified in Finding # 44 that C.R.'s progress from "wildcat to well-adjusted, normally developed child" was partly attributed by Hood's therapy. (Amended Appellant's App. p. 46). At the grandparent visitation status hearing in December 2015, Hood stated, "I do have bias and it is for the best interests of [C.R.]. Now in saying that it's important to be objective and my bias is not

toward what [Adoptive Father] thinks is best or what [the Paternal Grandparents] think is best but towards what therapeutically appears to be best for . . . [C.R.]" (Tr. p. 60). More significantly is that the visitation order of March 2014 mandated Hood to offer her commendation after the six months of supervised visits. Apple's role was specifically limited to a supervisory role and her recommendation on whether the visits should be moved to the Paternal Grandparents' home or how future visitations should proceed, was out-of-place.

[28] That said, we also address the trial court's Conclusion #3 stating that Hood's recommendation that visitation should be supervised four times a year for an *indefinite period* of time was unreasonable. Adoptive Father challenges this conclusion stating that it is erroneous and we agree. Hood's status report dated March 26, 2015, undeniably did not propose an end-date for the future supervised visits; however, at the status hearing, she advised that these supervised visits should possibly remain until C.R. entered his teen years "where he could [] speak about his own adjustment and his own needs." (Tr. p. 68). Because Hood did give an end-date to the proposed supervised quarterly visits, we conclude that the trial court's conclusion is erroneous in this respect.

[29] Consequently, we find Conclusion #4 is equally erroneous and unsupported by the evidence. As noted, the trial court concluded that Adoptive Father was unreasonable on relying on Hood's recommendation of future supervised visits. As discussed above, we concluded that Hood's recommendation on future supervised visits was reasonable because it was based on the Children's therapeutic needs, the fact that Apple was not aware of all the background

information, and because Apple viewed the Paternal Grandparents as her clients.

[30] Moreover, we find that Adoptive Father had some sincere reservations. At the status hearing in December 2015, Adoptive Father stated that when visitation was not taking place between August of 2013 and April of 2014, C.R. "recovered remarkably. [C.R.] went from a child that had trouble dealing with things to a normal child that wanted to do more things, expressed more things and became a happy child." (Tr. p. 138). Adoptive Father added that during the six months of supervised visitation, C.R. "became more irritated . . . [,]short tempered[,] and could not handle small problems so to speak." (Tr. p. 134). When asked if he concurred with Hood's recommendation of future quarterly supervised visits, Adoptive Father reiterated Hood's statement that the Children were well bonded with the Paternal Grandparents and that "there should be some contact." (Tr. p. 142). Based on our conclusion that Hood's recommendation was reasonable, and coupled with Adoptive Father's legitimate concern that C.R. was exhibiting problems following the six months of supervised visitation, we hold that the trial court's conclusion that Father was unreasonable in relying on Hood's recommendation is unsupported by the evidence and therefore erroneous.

### B. *Dr. Crane's Diagnosis of C.R.'s PTSD Symptoms*

[31] Next, we address Adoptive Father's contention that the trial court's findings regarding Dr. Crane are inconsistent and not supported by the evidence. Finding #42 of the trial court's order stated in its first sentence that Dr. Crane

no longer adheres to C.R.'s PTSD diagnosis and therefore, Hood's continued diagnosis of PTSD lacked medical basis. In its second sentence, the trial court noted that Dr. Crane's dementia makes his supervision of Hood unreliable with regard to whether Hood's current recommendation is valid. Adoptive Father argues that this finding is erroneous because (1) Dr. Crane originally approved Hood's recommendation with regards to C.R.'s PTSD diagnosis; and (2) the trial court's statement that Dr. Crane suffers from dementia but also giving significant weight to his testimony with respect to his nullification of C.R.'s former PTSD diagnosis, is an unclear and inconsistent statement.

[32] At the grandparent visitation status hearing in December 2015, Hood testified that she continued to see the Children for therapy while the supervised visits were ongoing. Hood stated that C.R. showed noticeable reduction in his PTSD symptoms during the period of supervised visitation and continued improvement was exhibited when visitation did not occur. Hood indicated that, presently, C.R. is a well-adjusted child who is getting straight A's in school, and his anxiety was much lower during the period of supervised visits, and nonexistent when he was not visiting with the Paternal Grandparents. Ultimately, Hood's recommendation was that, going forward, visitation should be supervised on a quarterly basis so as to "allow C.R. [to] have a life that is free from the former symptoms that he experienced." (Tr. p. 25).

[33] Notably, during her direct examination, Hood testified that she is not qualified to issue a PTSD diagnosis, however, as a licensed medical and family therapist, she is "qualified to suggest a diagnosis which is confirmed by a psychiatrist."

(Tr. p. 39). The record shows that shortly after biological mother's murder in 2009, Hood was appointed by the trial court to work therapeutically with the Children. Hood indicated that she discussed the case frequently with Dr. Annamis, the psychiatrist supervisor at the Indiana Center for Children and Families. Hood testified that Dr. Annamis was responsible for reviewing "treatment plans as well as our diagnosis." (Tr. p. 11). From the record, it appears that Dr. Annamis was involved at the initial stages, *i.e.*, sometime between 2009 and 2010 after which she had no further involvement. Between 2009 and 2010, Hood saw the Children for therapy, and after several sessions of play therapy, Hood diagnosed C.R. with PTSD. In December 2010, Hood was asked to engage the services of another psychiatrist, in this case, Dr. Crane. Dr. Crane reviewed the materials that Hood had sent him in relation to her therapy with the Children and conducted several assessments. Dr. Crane confirmed Hood's recommendation of C.R.'s PTSD symptoms.

[34] An integral issue in the First Appeal was whether C.R. suffered from PTSD. At the hearing of Adoptive Father's first petition to modify grandparent visitation, Dr. Crane established that he agreed with Hood's diagnosis of C.R.'s PTSD. In the First Appeal, we valued Hood's recommendation mainly due to Dr. Crane's endorsement and we partly determined that the trial court's order was erroneous because the evidence from the therapists, including Hood, confirmed C.R.'s PTSD symptoms, and those symptoms were heightened when C.R. was visiting with the Paternal Grandparents.

[35] Also, we agree with Adoptive Father's contention that Finding #42 is inconsistent and unclear in the following respects: In the first portion of that finding, the trial court stated that Dr. Crane no longer adhered to C.R. diagnosis of PTSD; however, in the second portion of that finding, it discredited Dr. Crane's supervision of Hood's recommendation based on his dementia. It seems as if the trial court credited Dr. Crane's repudiation of C.R.'s PTSD diagnosis; nonetheless, failed to give weight to his testimony based on his dementia. The conflicting nature of the two statements makes the clarity of this finding difficult. Moreover, we find that the last portion of Finding #42 inferring that Dr. Crane was responsible for supervising Hood's current recommendation, incorrect. Hood testified at the grandparent visitation status hearing in December 2015 that she needed a psychiatrist to approve any of her PTSD diagnoses. In the First Appeal, Hood's PTSD diagnosis of C.R. was endorsed by Dr. Annamis, and Dr. Crane. It was Hood's testimony at the status hearing that supervised visits were imperative so as to maintain the Children's overall progress. She noted that future supervised visits would also ensure that C.R. had a life that was free from *former PTSD symptoms*. Here, we find that it was not necessary for Hood's current recommendation, absent a PTSD diagnosis, to be endorsed by a psychiatrist. Her recommendation was simply based on the best interest of the child. As such, the trial court's suggestion that Dr. Crane was essential in endorsing Hood's current recommendation is an incorrect statement. Given the erroneous issues we have identified in this finding, we lack confidence in the accuracy of the judgment.

## III. *Remedy on Remand.*

[36] Based on our discussion, we have concluded that certain significant findings of the trial court were not supported by the evidence, and that significant conclusions were entered based upon those erroneous findings. Specifically, we have determined that Hood's decision to reject Apple's request of moving supervised visits to the Paternal Grandparents' home was not biased. On this issue, we established that Hood's refusal was founded on authentic concerns, *i.e.*, Apple's recommendation was based on a very narrow context, Apple had limited background information regarding the case, and because Apple viewed the Paternal Grandparents as her clients. Moreover, we noted that the March 2014 visitation order restricted visitation in agency setting and Apple's role was limited to supervising those visits. Accordingly, we established that Apple exceeded her mandate by suggesting how visits should proceed. Also, we determined that Hood's recommendation of supervised visits had a proposed end-date, *i.e.*, Hood stated that supervised visits should perhaps remain until C.R. entered his *teenage years* "where he could [] speak about his own adjustment and his own needs." (Tr. p. 68). In addition, we determined Father's reliance on Hood's recommendation was reasonable. With respect to the finding regarding Dr. Crane, we found that finding conflicting in some respects—the trial court assigned more weight to Dr. Crane's repudiation of C.R.'s former PTSD diagnosis while at the same time discrediting his testimony with respect to his dementia. Finally, we determined that it was not necessary for Hood's current recommendation of future quarterly supervised visitations,

absent a PTSD diagnosis, to be endorsed Dr. Crane.  Accordingly, we reverse the trial court's order based on the fact that those erroneous findings and conclusions go to the very heart of the matter and form a substantial portion of the trial court's judgment.

[37]     As we set out above, in the First Appeal, we determined that there was something stirring up C.R. when he visited with the Paternal Grandparents.  In light of that, on remand, we directed supervised visits lasting six months.  Hood was to fashion her recommendation following the six months of visitation.  Again, the main contested issue is the future course of the Paternal Grandparents' visitation following the six-month period.  At the grandparent visitation status hearing in December 2015, Adoptive Father introduced substantial evidence relating to C.R.'s former PTSD diagnosis, how those symptoms were exacerbated when C.R. visited with the Paternal Grandparents; how C.R. was alleviated from those symptoms when visitation was not occurring between August 2013 and April 2014; and the recurrence of those PTSD symptoms during the six-months of supervised visits.  Hood also gave her therapeutic opinion regarding C.R.'s PTSD symptoms since 2009.  Hood testified that in order to dispel all future concerns on the relapse of C.R.'s former PTSD symptoms, it was in C.R.'s best interest that future visits, at best be supervised four times a year.

[38]     Having determined that the trial court's order is defective, we must now determine the appropriate remedy.  We have previously concluded that an appropriate remedy on remand is entry of new findings and conclusions based

upon the existing record. *See In re Guardianship of A.L.C.*, 902 N.E.2d 343, 359-60 (Ind. Ct. App. 2009) (remanding for "more specific findings and conclusions," but "without a hearing."). Given the evidence before us, we hold that the trial court's order granting unsupervised visits to the Paternal Grandparents did not overcome Adoptive Father's *fit* decision to limit visitation based on Hood's recommendation. *See McCune*, 783 N.E.2d at 759. Accordingly, we remand to the trial court for entry of new findings and legal conclusions consistent with this opinion.

## CONCLUSION

In sum, we remand this case to the trial court for new findings and conclusions without hearing new evidence.

Reversed.

Bailey, J. and Barnes, J. concur